UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

ELIZABETH M. SHANK,                          Case No. 16-CV-1154 (PJS/FLN)

               Plaintiff,

v.                                                                      ORDER

CARLETON COLLEGE,

               Defendant.

---

Barbara P. Berens, Erin K. Fogarty Lisle, and Carrie L. Zochert, BERENS & MILLER, P.A., for plaintiff.

Sean R. Somermeyer and Jacqueline A. Mrachek, FAEGRE BAKER DANIELS LLP, for defendant.

Plaintiff Elizabeth Shank alleges that, while she was a student at defendant Carleton College ("Carleton"), she was raped by fellow students on two occasions. In this action, she brings various statutory and common-law claims against Carleton, including a claim under the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 et seq. Carleton now moves to dismiss Shank's amended complaint.

For the reasons that follow, the Court grants Carleton's motion in part and denies it in part. Specifically, the Court grants the motion with respect to Shank's Title IX claim insofar as that claim is based on the allegation that, by condoning underage and excessive drinking, Carleton was deliberately indifferent to an increased risk of sexual assault. The Court also grants the motion with respect to Shank's claim for intentional

infliction of emotional distress, except insofar as that claim is based on the allegation that Carleton coerced Shank into a one-on-one meeting with one of her assailants. Finally, the Court grants the motion with respect to Shank's claims of negligence per se, social-host liability under Minn. Stat. § 340A.90, and breach of contract.  The Court denies the motion in all other respects.

## I.  BACKGROUND

Shank's amended complaint alleges the following:

### A.  The Rapes

Carleton is a liberal-arts college in Northfield, Minnesota, with a total of about 2,000 students.  Am. Compl. ¶ 8.  Shank attended Carleton from 2011 to 2015.  Am. Compl. ¶ 7.  During orientation week of her freshman year, Shank met Student One, another freshman who lived in her dormitory.  Am. Compl. ¶ 77.  Shank and Student One attended a party on campus where upperclassmen were serving liquor to underage students.  Am. Compl. ¶¶ 80-82.  Both Student One and Shank drank to the point of intoxication.  Am. Compl. ¶ 83.  After the party, Shank accepted Student One's offer to walk her back to their dormitory.  Am. Compl. ¶ 83.  Student One then violently raped Shank in her dormitory room.  Am. Compl. ¶ 83.

The second rape occurred during the spring of Shank's sophomore year.  In April 2013, Shank attended an off-campus party sponsored by Carleton.  Am. Compl.

¶ 188.  Once again, upperclassmen provided alcohol to underage students (including Shank) at the party.  Am. Compl. ¶ 189.  After the party, Shank and some other students returned to campus and congregated in a room belonging to Student Two, a senior who lived in Shank's dormitory.  Am. Compl. ¶ 191.  Later in the evening, Shank became extremely dizzy and lost track of her surroundings after she accepted a drink from Student Two.  Am. Compl. ¶¶ 193-94.  Student Two then raped Shank.  Am. Compl. ¶ 195.

Shank experienced extreme mental, physical, and emotional trauma as a result of the rapes.  Shank had been a National Merit Scholar and had graduated at the top of her high-school class, yet, after the rapes, she had difficulty completing many of her college classes and ultimately dropped several of them.  Am. Compl. ¶¶ 54, 59, 94-95.  Shank alleges that, although she disclosed the rapes to and sought help from a number of Carleton officials, Carleton's response was woefully inadequate.  Among numerous complaints, Shank alleges that Carleton mishandled the disciplinary proceedings against her assailants, failed to impose adequate sanctions against them, and failed even to explain (much less to assist her with) such options as criminal prosecution, medical assistance, alternative housing arrangements, and academic assistance and accommodations.  Am. Compl. ¶¶ 5, 88, 92, 93-95, 109-10, 213-14.

*B.  Disciplinary Proceedings Involving Student One*

After the rape by Student One, Shank initially sought help from Carleton's on-campus health and counseling clinic.  Am. Compl. ¶¶ 86-87.  A counselor suggested that Shank could file a formal complaint.  Am. Compl. ¶ 88.  Shank did not do so.  Some months later, someone filed a community-concern form—an informal document used to notify Carleton of misconduct—that identified Student One as the perpetrator of a rape. Am. Compl. ¶¶ 97, 99.  The form did not identify Shank as the victim, but Student One was nevertheless furious with Shank.  Am. Compl. ¶¶ 99-102.

Carleton apparently learned that Shank was the victim of Student One because, after the community-concern form was filed, Carleton appointed Cathy Carlson (an associate dean of students) to be Shank's "sexual-misconduct support advisor."  Am. Compl. ¶ 106.  As a sexual-misconduct support advisor, Carlson's role was to discuss Shank's options with her, help her to find appropriate support, and assist her during the complaint process.  Am. Compl. ¶ 105.  Shank confided to Carlson that she was afraid to file a formal complaint because Student One was already furious at her.  Am. Compl. ¶ 111.  Carlson advised her that, if she was afraid of Student One, she should not file a formal complaint but instead should permit Carleton itself to proceed as the complainant.  Am. Compl. ¶¶ 113-14.  Shank followed Carlson's advice.  Am. Compl. ¶ 114.  As a result, Shank inadvertently forfeited (or was erroneously denied) significant

procedural rights, including the right to appear and speak at the hearing and the right to appeal.  Am. Compl. ¶¶ 131, 133, 141.  Instead, Shank was only able to submit a written statement about the rape.  Am. Compl. ¶¶ 117-123, 131.

Shank had difficulty composing her written statement.  She advised Carlson that she was afraid to disclose many of the details of the rape and that she needed assistance to complete the statement.  Am. Comp. ¶ 117-19.  Carlson assured Shank that the statement was sufficiently detailed to ensure that Student One would be suspended or expelled.  Am. Compl. ¶ 120.  Despite this assurance, Shank intended to describe the rape in full at the hearing, but was unable to do so because she was not permitted to attend.  Am. Compl. ¶¶ 123, 131.  Further, although Carleton's formal complaint against Student One should have triggered an investigation, no investigator ever contacted Shank, and Shank is unaware of any other investigatory steps that Carleton may have taken.  Am. Compl. ¶¶ 124-27.

An adjudicatory panel determined that Student One had violated Carleton's sexual-assault policy.  Am. Compl. ¶ 137.  The panel did not suspend or expel Student One, however.  Am. Compl. ¶ 138.  As far as Shank is aware, the only sanction levied against Student One was an order prohibiting him from having contact with Shank.  Am. Compl. ¶ 140.  Shank's parents requested that Carleton file an appeal, but Carleton did not do so.  Am. Compl. ¶¶ 144-45.

The panel issued the no-contact order to Student One in the spring of Shank's freshman year.  Am. Compl. ¶ 150.  During the fall of her sophomore year, Shank frequently saw Student One around campus and learned that he had not yet been served with the no-contact order.  Am. Compl. ¶¶ 147-48, 150.  Shank's overwhelming fear of encountering Student One (and, later, Student Two) was a significant factor in her academic difficulties.  Am. Compl. ¶ 212.  Although Shank believed that she would feel less threatened if she knew about all of the sanctions imposed on Student One, Carleton refused to disclose them.  Am. Compl. ¶¶ 149, 152.  Instead, a Carleton official told Shank that she would have to meet with Student One if she wanted to learn the full outcome of the adjudication proceeding.  Am. Compl. ¶ 153.  Shank reluctantly agreed to the meeting, which took place in October 2012.  Am. Compl. ¶¶ 160, 166.

At the one-on-one meeting, Student One did not apologize or express any remorse.  Am. Compl. ¶ 168.  Instead, he emphasized his anger at Shank and pressured her to lift the no-contact order.  Am. Compl. ¶¶ 168-69.  Feeling terrified, Shank agreed. Am. Compl. ¶ 170.  As a result, she continued to encounter Student One on campus throughout her remaining time at Carleton.  Am. Compl. ¶ 171.  In January of Shank's senior year, Shank asked that the no-contact order be reinstated, and Carleton agreed. Am. Compl. ¶ 176.  Student One proceeded to violate that order the following month, with little response from Carleton.  Am. Compl. ¶¶ 177-81.

*C.  Disciplinary Proceedings Involving Student Two*

Two days after being sexually assaulted by Student Two, Shank reported the rape to Carlson, her sexual-misconduct support advisor.  Am. Compl. ¶ 196.  Carlson told Shank that she had previously heard Student Two's name in connection with sexual misconduct, but that no one had ever filed a formal complaint against him.  Am. Compl. ¶ 197.  Carlson discouraged Shank from filing a formal complaint because Student Two would be graduating in a couple of months.  Am. Compl. ¶ 198.  Noting that Shank herself was in danger of an academic suspension, Carlson advised Shank to focus on her classwork.  Am. Compl. ¶ 199.  Carlson also suggested that, if Shank could not cope with Student Two's presence on campus during his remaining months, she should take a medical leave or change her major to a less-challenging one.  Am. Compl. ¶ 200.

A few weeks later, Shank and several other students filed community-concern forms complaining of Student Two's sexually predatory behavior.  Am. Compl. ¶¶ 201-03.  Carleton eventually prohibited Student Two from contacting Shank or the other complainants.  Am. Compl. ¶ 204.  Carleton did not take any other action against Student Two; he was allowed to remain on campus, and he was allowed to live in the same dormitory as Shank.  Am. Compl. ¶¶ 205, 207-08.

## II.  ANALYSIS

### A.  Standard of Review

In reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ.

P. 12(b)(6), a court must accept as true all of the factual allegations in the complaint and

draw all reasonable inferences in the plaintiff's favor.  *Aten v. Scottsdale Ins. Co.*, 511 F.3d

818, 820 (8th Cir. 2008).  Although the factual allegations need not be detailed, they

must be sufficient to "raise a right to relief above the speculative level . . . ."  *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint must "state a claim to relief

that is plausible on its face."  *Id.* at 570.

Ordinarily, if the parties present, and the court considers, matters outside of the

pleadings, a Rule 12(b)(6) motion must be treated as a motion for summary judgment.

Fed. R. Civ. P. 12(d).  But the court may consider materials that are necessarily

embraced by the complaint as well as any exhibits attached to the complaint without

converting the motion into one for summary judgment.  *Mattes v. ABC Plastics, Inc.*, 323

F.3d 695, 697 n.4 (8th Cir. 2003).  In this case, Carleton has submitted materials outside

of the pleadings, but the Court has not considered those materials, and therefore the

Court will not convert the motion into one for summary judgment.

*B.  Title IX*

Shank brings a claim under Title IX, which prohibits sex discrimination by

recipients of federal education funding.  Specifically, Title IX provides, in relevant part:

> No person in the United States shall, on the basis of sex, be
> excluded from participation in, be denied the benefits of, or
> be subjected to discrimination under any education program
> or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a).

The Supreme Court has held that a plaintiff who has been injured by student-on-

student (or "peer") sexual harassment may hold a funding recipient liable under

Title IX.  *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999).

But the funding recipient can be held liable only for its own misconduct; it cannot be

held vicariously liable for the misconduct of others.  *Id.* at 640-41.  To prevail on a peer-

harassment claim, therefore, a plaintiff must establish that the recipient acted with

deliberate indifference to acts of harassment of which the recipient had actual

knowledge.[1]  *Id.* at 646-47, 650.  As applied in this context, the deliberate-indifference

standard sets a very high bar for plaintiffs:  A funding recipient is not liable unless it

responded to acts of harassment in a manner that was "clearly unreasonable in light of

---

[1]The plaintiff must also establish that the harassment was so severe, pervasive,
and objectively offensive that it effectively barred the plaintiff's access to an educational
opportunity or benefit.  *Davis*, 526 U.S. at 633.  Carleton does not dispute that Shank has
adequately pleaded this element of her claim.

the known circumstances." *Id.* at 648.  Victims do not have the right to make particular

remedial demands; so long as the recipient's response was not clearly unreasonable, the

recipient will not be held liable.  *Id.* at 648-49.

1.  Increased Risk of Sexual Assault

Shank first contends that Carleton was deliberately indifferent to the risk of

sexual assault because it openly tolerated, condoned, and enabled underage and

excessive drinking which, in turn, increased the risk of sexual assault on campus.

The Court agrees with Carleton that Shank's allegations regarding Carleton's

tolerance of underage and excessive drinking do not state a claim under Title IX.  The

Supreme Court and the Eighth Circuit have both made clear that, to be held liable

under Title IX for sexual assault, a funding recipient must have actual knowledge of

*sexual assaults* and be deliberately indifferent to *those sexual assaults*.  *Davis*, 526 U.S.

at 633 (funding recipient must act "with deliberate indifference to known acts of

harassment"); *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003) ("For a public

university to incur liability under Title IX, it must be (1) deliberately indifferent (2) to

known acts of discrimination (3) which occur under its control." (citation and

quotations omitted)).  A recipient cannot be held liable merely because it *should* have

known of sexual assaults.  *See Davis*, 526 U.S. at 642 ("we declined the invitation to

impose [Title IX] liability under what amounted to a negligence standard—holding the

-10-

district liable for its failure to react to teacher-student harassment of which it knew or *should have* known"); *Ostrander*, 341 F.3d at 751 (abuse allegedly perpetrated by other fraternity members at other premises did not satisfy the "known acts" requirement).

Tolerating students' misuse of alcohol—even with knowledge that such misuse increases the risk of harmful behaviors such as sexual assault—is simply not the same thing as actual knowledge of sexual assault. The Court therefore grants Carleton's motion to dismiss Shank's Title IX claim to the extent that Shank seeks to hold Carleton liable for its alleged deliberate indifference to the risk of sexual assault arising out of underage and excessive drinking.[2]

## 2.  Inadequate Response

Shank next alleges that Carleton's response to the rapes was inadequate and that, as a result of Carleton's various failures, she was "excluded from participation in, . . . denied the benefits of, [and] subjected to discrimination under [Carleton's] education program" on the basis of sex in violation of Title IX. The Court finds that Shank's allegations concerning Carleton's inadequate response state a plausible Title IX claim.

---

[2]As noted above, Shank alleges that Carleton told her that it "had heard Student Two's name before in the context of sexual misconduct . . . ." Am. Compl. ¶ 197. This vague allegation may be closer to the mark, but it is still insufficient to establish deliberate indifference to the risk of sexual assault. *See Thomas v. Bd. of Trs. of the Neb. State Colls.*, No. 15-2972, 2016 WL 3564252, at *1-2 (8th Cir. July 1, 2016) (knowledge of dropped rape charge and accusations of sexual harassment were insufficient to establish that college had actual knowledge of a risk of harm).

As noted, Carleton cannot be held liable under Title IX unless its response was clearly unreasonable.  Shank alleges that Carleton failed to advise her of her procedural and substantive rights; wrongfully denied her the ability to participate in the adjudicatory hearing against Student One; discouraged her from pursuing a formal complaint against Student Two; took only minimal action against her assailants; coerced her into a one-on-one meeting with Student One (who then took the opportunity to pressure her into lifting the only sanction of which she was aware); and did not even enforce the minimal sanctions that it had imposed.  Carleton may well prevail on summary judgment after a full factual record is developed, but, at this point, the Court cannot hold as a matter of law that Carleton's response was not clearly unreasonable. The Court therefore denies Carleton's motion to dismiss Shank's Title IX claim to the extent that Shank seeks to hold Carleton liable for the way it responded to reports of her rapes.

## C.  ADA/Rehabilitation Act

Shank next brings claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 et seq., and § 504 of the Rehabilitation Act, 29 U.S.C. § 794, alleging that she suffered from post-traumatic stress disorder and that Carleton failed to accommodate her disability.[3]  Specifically, Shank alleges that Carleton breached its duty

---

[3]Claims under the ADA and § 504 may be analyzed together because they are "similar in substance" and "cases interpreting either are applicable and interchangeable

to accommodate her disability by refusing to suspend or expel either Student One or

Student Two; failing to remove notations from her academic record that she had

dropped several classes; and failing to offer other academic accommodations, such as

permitting her to attend classes remotely or allowing her to take only those classes held

in sections of the campus where Student One was unlikely to appear.  Am. Compl.

¶¶ 227, 234.

Carleton argues that Shank's ADA and § 504 claims fail because she never

requested these accommodations.  *See Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1077

(8th Cir. 2006) (plaintiff bears the burden of demonstrating that she requested

reasonable accommodations).  Shank alleges, however, that she asked that the

"dropped" notations be removed from her academic record.  Am. Compl. ¶¶ 94-95.  She

also alleges that Carlson assured her that her written statement regarding the first rape

would be sufficient to support the suspension or expulsion of Student One, Am. Compl.

¶ 120, which raises a reasonable inference that she requested that Student One be

suspended or expelled.  And Shank alleges that Carleton failed to provide her with

reasonable academic accommodations "despite her requests."  Am. Compl. ¶ 227(b); *see*

*also* Am. Compl. ¶ 234(b) (alleging that Carleton failed to offer academic

accommodations "despite her repeated requests").  These allegations are slender, but

_____

for analytical purposes."  *Bahl v. Cty. of Ramsey*, 695 F.3d 778, 783 (8th Cir. 2012) (citation
and quotations omitted).

they are (barely) sufficient to survive a Rule 12(b)(6) motion.  The Court therefore

denies Carleton's motion to dismiss Shank's ADA and § 504 claims.

### D.  Negligence

Shank next brings a claim of negligence premised on Carleton's alleged failure to

enforce its alcohol and drug policies and to take various preventative and remedial

actions to prevent sexual assault and deal with its aftermath.  Shank appears to be

seeking to hold Carleton liable not only for negligently failing to prevent her rapes, but

also for negligently responding to the rapes.

To prevail on a negligence claim, a plaintiff must establish "(1) the existence of a

duty of care; (2) a breach of that duty; (3) an injury; and (4) that the breach of the duty

was a proximate cause of the injury."  *Doe 169 v. Brandon*, 845 N.W.2d 174, 177 (Minn.

2014).  The existence of a duty of care is a threshold legal question.  *Domagala v. Rolland*,

805 N.W.2d 14, 22 (Minn. 2011).  Relying on precedent from other states, Shank

contends that Carleton owed her a duty as the owner and controller of the premises on

which the rapes occurred—or, alternatively, that Carleton voluntarily assumed a duty

to protect its students from being raped.

In Minnesota, landowners do not generally owe entrants onto their land any

duty to protect against criminal acts of third parties.  *See Funchess v. Cecil Newman Corp.*,

632 N.W.2d 666, 673-74 (Minn. 2001) (landlord's failure to repair broken lock and

intercom did not render it liable for tenant's murder by an intruder); *Pietila v. Congdon*, 362 N.W.2d 328, 333 (Minn. 1985) (homeowners owed no duty to protect private nurse from fatal assault); *Rasivong v. Lakewood Cmty. Coll.*, 504 N.W.2d 778, 783-84 (Minn. Ct. App. 1993) (college owed no duty to warn festival attendee about threat of gang violence at festival); *c.f. H.B. ex rel. Clark v. Whittemore*, 552 N.W.2d 705, 707-09 (Minn. 1996) (owners and manager of trailer park did not owe resident children a duty to protect them from another resident); *Donaldson v. Young Women's Christian Ass'n of Duluth*, 539 N.W.2d 789, 792-93 (Minn. 1995) (lodging house did not owe a duty to resident to protect resident from self-harm). This is related to (or perhaps a specific application of) the more general common-law rule that a person has no duty to protect another person from harm. *See Domagala*, 805 N.W.2d at 22-23.

These general rules are subject to various exceptions, however, including (1) where there was a special relationship between the defendant and the plaintiff; (2) where the defendant's own conduct created a foreseeable risk of harm to the plaintiff; and (3) where the defendant voluntarily assumed a duty of care toward the plaintiff. *Id.* at 23; *Bjerke v. Johnson*, 742 N.W.2d 660, 665 (Minn. 2007); *Williams v. Harris*, 518 N.W.2d 864, 868 (Minn. Ct. App. 1994). Determining whether these exceptions apply requires a careful consideration of the particular facts of the case. *See, e.g., Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165, 169-70 (Minn. 1989) (carefully examining the

particular characteristics of a downtown parking lot to conclude that the operator of the lot owed a duty of care to deter criminal activity on its premises).  The Court is skeptical that Shank will be able to establish any of these exceptions, but the Court will be better able to address Shank's negligence claim when it has a full factual record—a factual record that must be developed whether or not Shank's negligence claim survives. Carleton's motion to dismiss this claim is therefore denied.

The Court also notes that, even if Shank can establish that Carleton owed her a duty to *prevent* the rapes, Shank most likely cannot maintain a negligence claim on the basis of Carleton's *response* to the rapes.  Carleton's allegedly negligent response to the rapes caused Shank to suffer emotional injuries, but it did not inflict or risk inflicting any physical injuries.  The tort of negligent infliction of emotional distress is, however, strictly limited to situations in which the defendant placed the plaintiff in grave physical danger for a specifically defined period of time.  *Wall v. Fairview Hosp. & Healthcare Servs.*, 584 N.W.2d 395, 408 (Minn. 1998).

Shank alleges that the Carleton campus was a "zone of danger" because Carleton did not suspend or expel her rapists.  But this type of generalized risk is nothing like the type of specific risk of imminent physical injury that Minnesota courts have required before allowing recovery on claims for negligent infliction of emotional distress. *Compare Engler v. Ill. Farmers Ins. Co.*, 706 N.W.2d 764, 765-66, 770-71 (Minn. 2005)

(plaintiff who narrowly missed being struck by an out-of-control vehicle that hit and severely injured her young child could recover for distress from witnessing her child's injury) *with K.A.C. v. Benson*, 527 N.W.2d 553, 557-59 (Minn. 1995) (because plaintiff could not prove that she was actually exposed to the HIV virus, she was not within the zone of danger; mere possibility of exposure was insufficient) *and Stadler v. Cross*, 295 N.W.2d 552, 553-55 (Minn. 1980) (mother who was a few yards from the road where her child was struck by a car was not within the zone of danger and could not recover for her emotional distress).  Carleton did not raise this issue in its motion to dismiss, however, and therefore the Court need not resolve it at this time.

### E.  Negligence Per Se

Shank also brings a claim of negligence per se based on Carleton's alleged violation of the Northfield Social Host Ordinance.  That ordinance states, in relevant part:

> (f)    It is unlawful for a person to:
>
>     (1)    Host a gathering or an event at a residence or premises where alcohol or alcoholic beverages are present and the person knows that an underage person either:
>
>         a.    Consumes alcohol or an alcoholic beverage; or

        b.      Possesses alcohol or an
alcoholic beverage with
the intent to consume the
alcohol or alcoholic
beverage;

        and the person fails to take
reasonable steps to prevent
possession or consumption by the
underage person.

      (2)    Intentionally aid, advise, hire, counsel,
or conspire with or otherwise procure
another to commit the prohibited act
described above.

Northfield Ordinance § 50-88(f).  Violations of the ordinance carry criminal penalties.

*Id*. § 50-88(i) (violation is a misdemeanor punishable by fine, imprisonment, or both).

     As the text of the ordinance indicates, a conviction requires proof that the

defendant (1) hosted a gathering and (2) had actual knowledge that a particular person

(a) was at the gathering, (b) was underage, and (c) was consuming alcohol or possessing

alcohol with intent to consume it (or, alternatively, that the defendant intentionally

aided or conspired with another to host a gathering with such knowledge).  Logically,

then, the defendant must have had actual knowledge of the particular gathering at

which the drinking occurred (or was planned to occur).  Otherwise, the defendant could

not possibly have had actual knowledge that a particular person was at the gathering,

was underage, and was drinking or planning to drink.  *Cf. State v. Gunderson*, 812

N.W.2d 156, 160 (Minn. Ct. App. 2012) (where an element of an offense requires a

person to know of the nature of his conduct or attendant circumstances, the person

must be aware of the nature of his conduct or that such circumstances exist).  Shank has

not plausibly alleged, however, that Carleton had actual knowledge of the particular

gatherings at which the underage drinking that allegedly led to her rapes occurred.

It is true that, on the night that Shank was raped by Student Two, Shank

attended an off-campus party that was sponsored by Carleton.[4]  Am. Compl. ¶ 188.  But

Shank has not pleaded a plausible causal connection between an ordinance violation at

the off-campus party and the rape by Student Two.  At the time of the off-campus party,

Student Two was a senior in college, Am. Compl. ¶ 184, and Shank does not allege that

he was underage.  The only relevant ordinance violation at the off-campus party,

therefore, would be Shank's own alcohol consumption.  But Shank does not allege that

her alcohol consumption at the off-campus party caused her to become impaired or had

any other connection to being raped by Student Two.  To the contrary, Shank pretty

clearly suggests that she was *not* impaired until Student Two gave her a drugged drink.

That, however, occurred after the party, in Student Two's dormitory room.  *See* Am.

Compl. ¶¶ 192-94.  As there is no plausible allegation that Carleton was aware of the

---

[4]Shank's negligence per se claim appears to relate only to the rape by Student
One, and not to the rape by Student Two.  In case the Court's understanding of the
scope of her claims is mistaken, however, the Court addresses the negligence per se
claim as it may relate to the rape by Student Two.

gathering in Student Two's dormitory room, Shank has not sufficiently alleged a

relevant violation of the Northfield ordinance.[5]  The Court therefore grants Carleton's

motion to dismiss Shank's claim of negligence per se.  *See Johnson v. Farmers &*

*Merchants State Bank of Balaton*, 320 N.W.2d 892, 897 (Minn. 1982) (to establish

negligence per se, the statutory violation must have proximately caused the plaintiff's

injury); *Broken Aero Servs., Inc. v. Marquette Bank Monticello*, No. C2-96-550, 1996 WL

706834, at *3 (Minn. Ct. App. Dec. 10, 1996) (a claim of negligence per se requires proof

that a statute was violated).

*F.  Intentional Infliction of Emotional Distress*

Shank next brings a claim of intentional infliction of emotional distress.  To

prevail on a claim for intentional infliction of emotional distress, a plaintiff must

establish that: "(1) the conduct was extreme and outrageous; (2) the conduct was

intentional or reckless; (3) [the conduct] caused emotional distress; and (4) the distress

was severe."  *K.A.C. v. Benson*, 527 N.W.2d 553, 560 (Minn. 1995).  In addition, the

defendant "must intend to cause severe emotional distress or proceed with the

---

[5]Shank's consumption of the drink in Student Two's room may not have been a
violation of the ordinance for yet another reason:  It appears that, at the time Shank
consumed the drink, there were only two people present.  The ordinance, however,
requires a violation to occur at a "gathering or event," which requires the presence of
three or more people.  Northfield Ordinance § 50-88(e), (f)(1).

knowledge that it is substantially certain, or at least highly probable, that severe emotional distress will occur." *Id.*

To be considered "extreme and outrageous," the conduct must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 439 (Minn. 1983) (citation and quotations omitted).  The tort is "sharply limited to cases involving particularly egregious facts and . . . a high threshold standard of proof is required to submit the claim to a jury." *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003) (citation and quotations omitted).

Shank alleges that Carleton's inadequate response to her rapes constituted intentional infliction of emotional distress.  She points in particular to Carleton's conduct in causing her to meet one-on-one with Student One; failing to suspend or expel Student One or Student Two; failing to appeal the minimal sanctions against Student One; failing to provide the no-contact order to Student One until months after it was issued; refusing to give Shank the written outcome of the adjudication hearing against Student One; failing to take action in response to Student One's violation of the no-contact order; and allowing the campus to be a zone of danger for Shank.  Am. Compl. ¶ 247.

For the most part, the Court agrees with Carleton that its response cannot be considered atrocious or utterly intolerable to a civilized community.  And, for the most part, Shank's allegations are not sufficient to raise a plausible inference that Carleton acted either intentionally or recklessly in causing emotional distress.  Carleton took seriously Shank's reports of rape; it initiated a formal complaint against Student One, it took disciplinary action against both Student One and Student Two, and it took some steps to counsel and aid Shank.  Carleton's conduct may have been inadequate or even "clearly unreasonable" for purposes of Title IX, but there is a big difference between conduct that is clearly unreasonable and conduct that is utterly intolerable in a civilized society.  Civilized societies tolerate a lot of unreasonable conduct.

In one respect, however, the Court finds that Shank's allegations are sufficient to state a claim of intentional infliction of emotional distress:  Shank has plausibly alleged that Carleton coerced her into a one-on-one meeting with her assailant, knowing that such a meeting was likely to cause her severe emotional distress.  *See* Am. Compl. ¶¶ 163-64 (describing a 2011 letter from the Department of Education stating that it is "improper for a student who complains of harassment (this includes sexual assault and rape) to be required to work out the problem directly with the alleged perpetrator" and that such meetings are "not appropriate even on a voluntary basis").  Moreover, the Court has no trouble concluding that it is plausible that the meeting caused severe

emotional distress; Shank plausibly alleges that the forced encounter with her rapist left her terrified and deprived of the very sanction meant to protect her safety on campus. The Court therefore grants Carleton's motion as to Shank's claim of intentional infliction of emotional distress except to the extent that it is based on Carleton's allegedly coercing her into meeting with Student One.

### G.  Minn. Stat. § 340A.90

Shank next brings a claim under Minn. Stat. § 340A.90, Minnesota's social-host liability statute.  That statute provides, in relevant part:

> A spouse, child, parent, guardian, employer, or other person injured in person, property, or means of support, or who incurs other pecuniary loss, by an intoxicated person under 21 years of age or by the intoxication of another person under 21 years of age, has for all damages sustained a right of action in the person's own name against a person who is 21 years or older who:
>
> > (1) had control over the premises and, being in a reasonable position to prevent the consumption of alcoholic beverages by that person, knowingly or recklessly permitted that consumption and the consumption caused the intoxication of that person; or
> >
> > (2) sold, bartered, furnished or gave to, or purchased for a person under the age of 21 years alcoholic beverages that caused the intoxication of that person.

Carleton argues that, by its plain terms, the statute only applies "against a person who is 21 years or older," and therefore it does not apply to entities. The history of the social-host liability statute supports Carleton's view.

In 1972, the Minnesota Supreme Court interpreted Minnesota's Civil Damages Act broadly to impose liability against anyone who violated liquor laws, including a social host. *See Koehnen v. Dufuor*, 590 N.W.2d 107, 109 (Minn. 1999) (describing history of the Civil Damages Act). The legislature reacted by amending the Civil Damages Act to limit liability to persons who illegally sell liquor.[6] *Id.* at 109-10.

As a result of this change, the Minnesota Supreme Court held that the statute preempted any common-law cause of action for negligence against a social host who furnishes liquor to any guest, including a minor. *Id.* at 110-11. In response, the legislature added language to the Civil Damages Act stating that "[n]othing in this chapter precludes common law tort claims against any person 21 years old or older who knowingly provides or furnishes alcoholic beverages to a person under the age of 21 years." *Id.* at 111 (quoting Minn. Stat. § 340A.801, subd. 6). Despite this addition, the Supreme Court continued to refuse to recognize a common-law cause of action against a social host. *Id.* at 111-13. The legislature responded by enacting § 340A.90, which creates liability for social hosts who serve alcohol to minors.

---

[6]The original amendment also permitted liability against persons who barter liquor, but that provision was later eliminated. *Koehnen*, 590 N.W.2d at 111.

The legislative history of § 340A.90 demonstrates that the legislature chose its words carefully.  The legislature was well aware of—in fact, was responding to—rulings of the Minnesota Supreme Court that delineated the scope of liability for furnishing liquor to others.  *Koehnen*, 590 N.W.2d at 112 ("Where the legislature has perceived this court's holdings to have strayed from its intent, it has reacted by amending the Act accordingly.").  As the Minnesota Supreme Court stated, "[t]his is not an area of the law which suffers from legislative neglect."  *Id.*

With that in mind, the Court finds that § 340A.90 imposes liability only on natural persons age 21 or older.  Had the legislature intended otherwise, its reference to the age of the "person" would make no sense.  Moreover, this reference echoes the statute's other references to persons *under* age 21, which quite clearly refer only to natural persons.  The  most natural reading of the statute, then, is that the phrase "person who is 21 years or older" refers only to a human being who is age 21 or older, and not to anything or anyone else.

It is true, as Shank argues, that Chapter 340A of the Minnesota Statutes incorporates a definition of "person" that "may extend and be applied to bodies politic and corporate, and to partnerships and other unincorporated associations."  Minn. Stat. § 645.44, subd. 7; *see also* Minn. Stat. § 340A.101, subd. 23 (stating that "person" has the meaning given in Minn. Stat. § 645.44, subd. 7).  As Carleton notes, however, "may" is

permissive, meaning that the definition need not necessarily embrace entities.  *See*

Minn. Stat. § 645.44, subd. 15 ("'May' is permissive").  Moreover, § 645.44 specifically

states that the defined terms listed in the statute "shall have the meanings given them in

this section, *unless another intention clearly appears*."  Minn. Stat. § 645.44, subd. 1

(emphasis added).  In the case of the word "person" as used in § 340A.90, another

intention clearly appears:  Both in the phrase "[a] person under 21 years of age" and in

the phrase "a person who is 21 years or older," § 340A.90 is clearly referring to natural

persons, not to "bodies politic and corporate."  Particularly in light of the care and

attention that the Minnesota Legislature has given to the issue of dram-shop and social-

host liability over the years, the Court construes the language of § 340A.90 to mean

exactly what it says.

      The Court also rejects Shank's suggestion that Carleton can be held vicariously

liable under the social-host statute.  To begin with, the Minnesota Supreme Court has

been cautious about extending vicarious liability into this area.  *See Urban v. Am. Legion*

*Dep't of Minn.*, 723 N.W.2d 1, 4-7 (Minn. 2006) (declining to impose vicarious liability on

the state and national chapters of a local organization that sold liquor to a driver who

later caused an accident).  More importantly, the handful of cases decided under

§ 340A.90 give no hint that a defendant can be held vicariously liable for a violation of

that statute.  To the contrary, those authorities strongly suggest otherwise. *See Sinn v.*

*Gerving*, No. A06-93, 2006 WL 2531239, at *2 (Minn. Ct. App. Sept. 5, 2006) (rejecting

common-law negligence claims against parent whose underage daughter served alcohol

to other minors and noting that parent could not be liable under § 340A.90 because

parent did not knowingly permit the alcohol consumption).  The Court therefore grants

Carleton's motion to dismiss Shank's claim under § 340A.90.

### H.  Breach of Contract

Finally, Shank brings a breach-of-contract claim premised on Carleton's Student

Handbook.  Shank contends that Carleton breached its promises to:

- maintain a campus environment "free of the deteriorating effects of drug and alcohol abuse";

- "foster[] a safe environment, free of sexual misconduct in any form";

- hold "[i]ndividuals who engage in behaviors that violate Carleton's Policy Against Sexual Misconduct . . . responsible for their actions";

- "respond to reports of sexual misconduct through established procedures that are comprehensive in scope, supportive in approach, and fair in execution";

- "be guided by the goal of empowering the individual who has been subject to the misconduct and allow[] that individual to retain as much control over the process as possible"; and

- "have in place equipment, policies and procedures to help protect our residents."

Am. Compl. ¶ 260.

Minnesota has rejected a "rigid importation of contractual doctrine" into the student-university relationship.  *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108, 113 (Minn. 1977).  Accordingly, "Minnesota courts are generally reluctant to find contractual obligations between students and their schools based upon student handbooks."  *Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d 464, 470 (Minn. Ct. App. 2001).  To state a claim for breach of a university handbook, therefore, a plaintiff must establish that (1) the institution breached a specific promise and (2) the claim would not involve an inquiry into the nuances of educational processes and theories.  *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 473 (Minn. Ct. App. 1999).

The promises that the court found potentially enforceable in *Alsides* included highly specific promises to provide instruction on particular topics, to provide a particular number of hours of instruction, and to have a sufficient number of operating computers to teach a particular course.  *Id.* at 474 n.3.  Unlike those promises, the promises on which Shank relies—such as promises to be "supportive" and "fair"—are broadly worded generalities that are not capable of objective application.  Because these promises are too general to be enforceable, the Court grants Carleton's motion to dismiss Shank's breach-of-contract claim.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.      Defendant's motion to dismiss [ECF No. 13] is GRANTED IN PART and

        DENIED IN PART.

2.      The motion is GRANTED with respect to the following claims:

        a.      Count I to the extent that it alleges that, by condoning underage

                and excessive drinking, defendant was deliberately indifferent to

                an increased risk of sexual assault.

        b.      Count IV to the extent that it alleges negligence per se.

        c.      Count V, except to the extent that it rests on defendant's alleged

                conduct in coercing plaintiff to meet one-on-one with Student One.

        d.      Counts VI and VII.

3.      The motion is DENIED in all other respects.


Dated:  January 9, 2017                        s/Patrick J. Schiltz
                                               Patrick J. Schiltz
                                               United States District Judge