IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| Elizabeth M. Shank, | Court File No. 16-cv-1154 ECT/HB |
| Plaintiff | **PLAINTIFF'S MEMORANDUM OF LAW OPPOSING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Carleton College, | |
| Defendant. | |

---

### INTRODUCTION

Carleton College is a renowned educational institution. Elizabeth Shank believed the school would be great and was committed to graduating from there. On the night of September 10, 2011, two days before Shank began freshman classes, she was raped in her dormitory room by a fellow freshman and dormitory resident ("Student One"). In her sophomore year, Shank was raped again by another fellow student and dormitory resident ("Student Two"). Carleton did a number of things attempting to assist Shank, and as to be expected, discusses them in its opening brief. Carleton takes it a step further, however, claiming as a result of those things there are NO material fact disputes. Def.'s Mem. ("D.M.")1-2.

That is false. Carleton's brief ignores substantial evidence (much from its own witnesses) demonstrating many material fact disputes and several times conclusive evidence that supports Shank's claims.

Carleton's brief also ignores established statutory and case law, most notably

Judge Schiltz's decision on Carleton's motion to dismiss, which establishes the legal template for this motion. Judge Schiltz declined to dismiss Shank's Title IX claim based on Carleton's deliberate indifference in responding to the two rapes.[1]

Judge Schiltz also refused to dismiss Shank's negligence claim, which included Carleton's "negligently responding to the rapes."[2] Carleton's brief nonetheless ignores the bulk of Shank's negligence claim, including its negligence in the adjudicatory process against Student One, its multiple violations of its own policies, its failure to take reasonable steps to protect Shank, and its imposition of a sanction on Student One requiring him to have a "mediated conversation" with Shank, a conversation Carleton then forced Shank to have by claiming (incorrectly) Shank must meet with him to learn about all of his sanctions.

This case gives voice to the trauma Shank has suffered because of Carleton's institutional betrayal, a doctrine that goes a long way to validating why Carleton's misconduct was and continues to be so devastating to Shank.[3] Shank displays many of the classic reactions of a person who has suffered betrayal by an institution on which she was dependent (for example, evidence that Shank at various times blamed herself,

---

[1] *Shank v. Carleton College*, 232 F. Supp. 3d 1100, 1110 (D. Minn. 2017). Judge Schiltz also declined to dismiss Shank's ADA/Rehabilitation Act and intentional infliction of emotional distress ("IIED") claims. *Id.* at 1110, 1114.

[2] *Id.* at 1111.

[3] Institutional betrayal results from an institution's wrongdoings against individuals dependent on that institution, including the failure to prevent or respond supportively to wrongdoings by individuals (e.g., sexual assault), committed within the context of the institution. Carly P. Smith & Jennifer J. Freyd, *Dangerous Safe Havens: Institutional Betrayal Exacerbates Sexual Trama*, 26 J. Traumatic Stress 119, 120 (Feb. 2013).

changed or was unable to make up her mind, minimized her trauma, or thanked persons), reactions Carleton relies on, ironically, to claim entitlement to summary judgment.[4]

Shank has engaged three leading experts to put Shank's reactions and Carleton's conduct in context:  Brett Sokolow on the standards of care in colleges' handling of sexual misconduct matters;[5] Dr. Mary Koss on the typical characteristics of sexual assault victims and restorative justice;[6] and Dr. Jennifer Freyd on institutional betrayal and trauma betrayal and the devastating effects on persons subjected to it.[7]  Each published a

---

[4] Carleton cherry picks documents to paint the picture that Shank was just fine and thought Carleton supportive.  D.M.1; *id.*5 (Shank "felt 'fantastic'" about ongoing therapy plan); *id.* (new room move "has literally been amazing"); *id.*7 n.4 (writing statement about Student One "beneficial for [her] healing process"); *id.*at 9 ("probably better" she could not read Student One's statement); *id.*11, 17 (Shank's mother grateful and said Shank "loved Carleton"); *id.*12 (Shank thanked Carlson for "understanding and support"); *id.* 14 (Student One meeting went "well" and things were "better"); *id.*17 (Shank "doing well" after no-contact order reinstated).

   **Such documents merely raise fact disputes.**  Every time Shank claimed she was better, another document or event showed she was not.  S.App.1-2(███████████████); S.App.3-8(██████████████████); C.App.669(9/12/12 community concern form about Shank's precarious state); C.App.639(10/17/12 Carlson email disclosing Shank "[had] gone back in time emotionally" after Student One meeting).

   Dr. Freyd testified that: "a school could do 20 things right, and if they do one thing wrong, that one wrong can still be institutional betrayal.  The 20 right things don't necessarily mitigate against the one wrong thing."  S.App.12-13(Freyd Dep. 83-84).

   **Cites to "S.App." refer to Shank's appendix; cites to "C.App." refer to Carleton's appendix. Citations to specific pages of documents or depositions in those appendices are included in parentheses after the appendix cites.**

[5] Sokolow is an attorney whose expertise is advising colleges about risk management in the handling of student sexual misconduct.  He is vastly qualified to do this and testify regarding school industry standards.

[6] Mary P. Koss, PhD, is a Regents Professor at Zuckerman College of Public Health at the University of Arizona.  She earned her doctorate in clinical psychology from the University of Minnesota.

[7] Jennifer J. Freyd, PhD, is a 2018-19 Fellow of the Center for Advanced Study for the Behavior Sciences, Stanford University, and Professor of Psychology, University of Oregon.  She is an expert on trauma betrayal and institutional betrayal.

report in this case and was deposed by Carleton.

There are material fact disputes regarding Shank's claims, including on all issues Judge Schiltz called out in his order. Carleton's counsel has also admitted many of those fact disputes. Accordingly, the Court should deny Carleton's motion.

## SUBSTANTIAL EVIDENCE SUPPORTS SHANK'S CLAIMS

## I.   CARLETON'S LONG HISTORY OF WRONGDOING IN RESPONDING TO CAMPUS SEXUAL ASSAULTS.

Carleton claims to be "recognized as a leader in preventing and responding to sexual violence." D.M.2. But Carleton's dereliction in responding to sexual violence led both to a 1991 lawsuit and the 1992 passage of the Campus Sexual Assault Victim's Bill of Rights ("CSAVBR").[8] The CSAVBR was enacted to increase schools' protection of sexual assault victims and "to combat the re-victimization of rape survivors at college campuses…[because] **many image conscious schools were more concerned about protecting their image than seeing justice done**")(emphasis added).[9]

The 1991 lawsuit triggering that legislation was brought by four students/alumnae challenging Carleton's deplorable response to their rapes on campus. *Baumann v. Carleton College*, Case No. 66-C8-91-000435 (Scott Cty. 1991).[10]

In the lawsuit's settlement, Carleton agreed:

Since victims of sexual assault are under great stress, they need support and assistance from professionally trained counselors in making critical choices about how to proceed with either criminal complaints or College disciplinary proceedings;

---

[8] S.App.15-15.02(5/15/91 AP article); S.App.16(5/15/91 STARTRIBUNE article).
[9] S.App.17.
[10] Sokolow Decl. Ex. 1 at 28-29.

The additional stress and potential revictimization as a result of a victim confronting her aggressor on campus are of special concern, and available College sanctions need to address this issue explicitly; and

. . .  an individual who has sexually assaulted women in the past may pose a threat to other women in the future if appropriate disciplinary action is not taken….

S.App.18-22(joint statement).

Yet almost twenty years later, Carleton failed to fulfill those undertakings when responding to the two rapes here.  Indeed, after this suit was filed, both an article published in Carleton's student newspaper[11] and a posting by a former Carleton sexual assault counselor noted the similarities between the two cases.[12]

Over the years, students have repeatedly demanded Carleton improve its response to sexual assault.[13]  For instance, in 2008, a number of survivors formed a group to challenge Carleton's mishandling of sexual assaults.[14]

In 2015, another student started a petition seeking revisions to Carleton's sexual misconduct policies, including the minimal level of sanctions levied:  "[t]hough Carleton takes a punitive approach in other forms of misconduct, such as academic, **sexual violence is considered 'a learning opportunity.'"**[15]

---

[11] S.App.23-25.

[12] S.App.26-49("deeply discouraging similarities between the [two] complaints").

[13] An editorial in a 2010 issue of the student newspaper noted Carleton needed improvements in order to "deal[] productively with sexual violence."  S.App.52. Although the editorial praised a 2010 revamp of Carleton's sexual misconduct policies, *id*., the very next year, Carleton began violating many of those policies when dealing with Shank.

[14] S.App.53(CARLETONIAN 2008).

[15] S.App.56(CARLETONIAN 2015)(emphasis added).

Carleton continues its pattern of arrogance, victim blaming, and deliberate indifference/disregard in the face of years of demands for change. **Carleton's arrogance in this regard is likely one of the reasons why it has been so blind to its misconduct in this case and so committed to blaming the victim.**

## II.     CARLETON ADMITTEDLY CONDONES UNDERAGE DRINKING.

Consistent with its blame-the-victim tactics, Carleton asserted Shank attended programs on Carleton's alcohol policy and knew underage drinking was prohibited. D.M.2-3. Carleton then shamed Shank for attending parties and becoming intoxicated. *Id*.3. Such victim-blaming does not excuse Carleton's deliberate indifference/disregard and negligence in this case.

Carleton's argument also ignores its own witnesses' admissions regarding the school's well-known, longstanding refusal to enforce its written alcohol policies, especially those pertaining to underage drinking. For example, Carleton's 30(b)(6) witness on the topic of its alcohol culture from 2011 to 2015, admitted "we didn't distinguish between who is underage or who is not" for purposes of student drinking. C.App.251(Gordon 25).

Hudlin Wagner, then Dean of Students, testified she was not surprised Shank stated resident assistants ("RAs") told her at the start of her freshman year it was okay for underage students to drink in their rooms. C.App.473(23). Other Carleton witnesses agreed Shank's statement was not a surprise.[16]

---

[16] Amy Sillanpa, Carleton's Associate Director of Student Life and its sexual misconduct complaint process coordinator, testified the same way, C.App.332(14), as did Julie

This yawning gap between written policy and reality was confirmed by a consultant Carleton hired in 2014 to evaluate its social misconduct policies:



S.App.71(Jueds Report 12).

This failure is troubling because Carleton knows drinking is the number one factor in campus sexual assaults, a fact acknowledged in Carleton's sexual misconduct training materials and by several Carleton witnesses.[17]

Carleton's willful blindness and illegal condonation of underage drinking, despite the known risks of alcohol, created a culture of sexual assault.[18]  Shank suffered as a result of that culture and Carleton's longstanding pattern of deliberate indifference to the rights of sexual assault victims.

---

Thornton, an associate student dean who was also on Carleton's Title IX lead team. C.App.424(91-92).
[17] C.App.229-30(Dunnewold 92-93); S.App.128, 142-43; C.App.415(Thornton 57); C.App.301-02(Mullen 56-57).
[18] Koss Decl. Ex. 1 at 3-5.

III.    **CARLETON WAS DELIBERATELY INDIFFERENT TO SHANK'S RIGHTS AND SAFETY AND WAS NEGLIGENT WHEN RESPONDING TO THE FIRST RAPE.**

A.    *The First Rape.*

Shank came to Carleton in early September 2011 to start her freshman year. C.App.28(29).  Four days later, she was raped in her dormitory room by Student One, a seventeen-year-old freshman whose dorm room was on the same floor.  C.App.33(51); C.App.65(163).  Before the rape, both had gone to on-campus parties hosted by upperclassman who provided them with alcohol. [19]

Two days later, Student One sent a Facebook message to Shank admitting he "didn't seek consent from [Shank]."[20]

B.    *Carleton's Student Health and Counseling Center ("SHAC") Deliberately Disregarded Shank's Rights and Safety after the First Rape.*

Earlier that same day, Shank had gone to SHAC to get a transportation token to the local hospital for a rape examination after learning about the tokens on Carleton's website.  C.App.34(53).  Shank told a nurse "she might have been raped."[21]  Both the nurse and the receptionist[22] refused Shank's request for a token.[23]

Carleton's Sexual Misconduct Policy in 2011-12 ("SM Policy") provided, however, that students could obtain vouchers for transportation to the hospital for rape

---

[19] C.App.31-32(Shank 44-45).
[20] C.App.621.
[21] The written record of Shank's visit to SHAC states "[s]he believes she gave consent," C.App.578, but Shank denied it.  C.App.35(58).
[22] Carleton submitted the SHAC receptionist's affidavit, who denied that Shank asked for a token or a rape exam, C.App.968-70, thus creating a material fact dispute.
[23] C.App.34, 39(53, 55, 75-76).

exams.  C.App.567.  Julie Thornton, Carleton's former associate dean of students and

Title IX Coordinator, confirmed Shank had an absolute right to obtain a token from

SHAC and the refusal violated Carleton's SM Policy.[24]

The nurse also discouraged Shank from obtaining a rape exam and "encouraged

[Shank] to talk to [Student One] about it because communication in these situations is

important."[25]

The next day, Shank met with a SHAC counselor who also talked her out of a rape

exam.  C.App.35-36(60-64).  When Shank expressed concern about the potential effects

of the incident, the counselor said it didn't have to be "an issue" (affecting Shank's well-

being) unless she wanted it to be.[26]  *Id*. at 63-64.[27]

SHAC personnel also failed to advise Shank about the alternatives they were

required to offer under Carleton's existing policies, including, "at a minimum, of the

---

[24] C.App.466(259-60).  Cathy Carlson, another associate student dean ultimately
appointed Shank's sexual misconduct support ("SMS") advisor, testified SHAC "should"
provide tokens and students "would not be talked out" of obtaining a token to get a rape
exam.  S.App.198-200(50-52).

[25] C.App.35, 39-40(Shank 58, 75-78).  That was dreadful advice.  As Dr. Freyd testified,
when Shank finally met with Student One more than a year later, the results were
"disastrous."  S.App.14.03(115)(her advice was "don't put these two people alone in a
room together"); *infra* (detailing meeting).

[26] Freyd Decl. Ex. 1 at 12, 16(opining that the SHAC counselor's comments regarding
Shank's response were evidence of two elements of institutional betrayal:  "creating an
environment in which this type of experience seems common or normal" and "denying
[Shank's] experience in some way").

[27] The counselor subsequently submitted a community concern form ("CCF") about
Shank: ███████████████████████████████████████████████████████
████████████████████████████████████  C.App.599; *infra* n.29 (defining CCFs).
Carleton's SM Policy provided sexual intercourse with an incapacitated person (including
a person who blacked out) was sexual assault.  C.App.558-59.

options of criminal prosecution, medical assistance, the internal complaint process, alternative housing assignments, confidential counseling, and academic assistance alternatives."[28]

The foregoing demonstrates material fact disputes regarding whether Carleton acted with deliberate indifference/disregard and negligence when, inter alia, refusing to provide Shank with a token, discouraging her from obtaining a rape exam, minimizing her immediate emotional reaction to the incident, and encouraging her to talk with Student One.

### C. *Shortly after the First Rape, Carleton's Personnel Ignore that Shank Was* ▮▮▮▮▮▮▮▮ *and Struggling in Class.*

Carleton's opening brief fast forwards from September 2011 to February 2012, skipping over evidence of its deliberate indifference/disregard for Shank's safety and struggles during that period.  In early October, someone submitted a CCF[29] about an unnamed student with apparently ▮▮▮▮▮▮▮▮▮▮▮▮ who was identified several days later as Shank.[30]  Thornton forwarded that CCF to Joe Baggot, the associate Dean for Freshmen, Kaaren Williamsen, Carleton's Deputy Title IX Coordinator, and Joanne Mullen, Carleton's Title IX Coordinator.[31]  Baggot testified he did not think he ever followed up on this CCF because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[28] S.App.228, 232.
[29] A CCF is an "[o]nline form to inform the College of incidents of sexual misconduct or other concerning behavior."  C.App.541.
[30] S.App.1-2.
[31] S.App.1. Mullen's role was part-time.  C.App.343(Sillanpa 61-62).  She was also the investigator in the Student One proceeding.  *Infra.*

███████████████████████ C.App.105-06(42-47).

On October 24, 2011, the Dean of Students' Office sent an email to Shank stating her professor had informed the Office she was struggling in math, and "Baggot, your class dean, would like to meet with you to discuss your progress and identify resources which may help you successfully pass the class." S.App.237. Baggot testified he never followed up or met with Shank about her struggles in math either. C.App.106-07(48-51).

The foregoing evidence raises material fact disputes regarding whether Baggot or any of the other deans' failure to follow up with Shank after those warning signs constitutes deliberate indifference/disregard, negligence and/or a failure to provide Shank with academic accommodations.

### D.    Carleton's Failure to Remove Posters of Student One Was Deliberately Indifferent to Shank's Rights and Safety.

After returning to campus following winter break of her freshman year, Shank saw promotional Carleton track team posters around campus,[32] including one of a half-naked Student One with the headline "Carleton Track and Field." C.App.44-45(95-97); S.App.241("Student One Poster.")[33] Copies of the Student One Poster were hung, among other places, in stairwells at the entrance of Shank's dormitory where she had to walk if leaving or entering. C.App.45(97-98). The Student One Posters caused Shank to

---

[32] Williamsen testified that "[s]paces to post by any organization were available across campus." C.App.507(48). Carleton had in place a policy encouraging poster promotions, S.App.238-40; that policy granted a license to hang unapproved posters and imposed a commensurate duty on Carleton. S.App.238-40.

[33] When shown the Student One Poster, Thornton testified she was not surprised to see it because "many [Carleton] teams do this." C.App.430(117-18).

██████████████     C.App.44(96).   █████████████████████████████████

███████████████████████████████████████     C.App.43-44(90-93).[34]

Shank's contemporaneous hospital records corroborate her testimony regarding

the posters:   ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

S.App.3, 8.

Shank returned to campus on February 15, 2012 and met with Baggot for the first

time the next day.  C.App.593.  Shank testified she told Baggot she had been raped by a

fellow student who lived on the same dormitory floor, was on an athletic team, and was

on a poster displayed around campus which "triggered the memories of the violence" and

caused her to feel trapped.  C.App.47(106-07).

Baggot did nothing about the posters;[35] they were still hanging in Shank's

dormitory when she moved in April.  S.App.243-44(Shank ¶3).

---

[34] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████   S.App.242(CCF).

[35] As with most issues, Carleton blames Shank.  It argues "[i]t is undisputed that Shank did not ask Baggot to do anything about the posters," D.M.4, as if that excuses anything. Carleton's argument is textbook willful blindness.  It is obvious a woman would be extremely upset by posters of her half-naked rapist displayed in locations where she was forced to pass them.  Shank told Baggot the posters "triggered the memories of the violence" and that she felt "trapped," C.App.47(106-07), clearly red flags.  Carleton takes refuge in its unfounded belief it was required to do little or nothing unless and until a rape victim made a specific request.  Carleton's view of its obligations (or lack thereof) is contrary to law as well as Carleton's voluntary assumption of various duties to students, including, inter alia, a duty to maintain a safe campus, *infra* n.39, and a duty to offer rape victims options like alternative housing.  *Supra* text accompanying n.28.

12

Baggot testified, however, he did not remember Shank telling him about the posters and if she had, he would have remembered.  C.App.111(66).  After that first meeting, Baggot prepared an email and a CCF stating Shank had been raped in the fall by another student who was on a Carleton sports team and lived on the same dormitory floor.  C.App.647; C.App.593.  Baggot's email also reported Shank's post-trauma emotions had "recently…become more difficult for her."  C.App.647.

Baggot's email and CCF corroborate Shank's testimony she had told him about the poster.  Shank's mother also confirmed "there was had [sic] this poster [of Student One] and [my daughter] told the dean about, Dean Baggot, because I know there's several deans, and it was upsetting her." C.App.371(96).

The Court should therefore deny Carleton's motion on Shank's claims based on the poster.

### E.   Carleton's Failure to Offer Shank Alternative Housing after Learning She Was Raped by a Fellow Dormitory Resident Demonstrates Carleton's Deliberate Indifference/Disregard and Negligence.

Baggot's CCF, which was sent to Thornton and Mullen, clearly disclosed Shank had been raped by another student living on the same dormitory floor.  C.App.593.[36]  Yet not one of those three, or anyone else from Carleton, ever informed Shank she was entitled to "alternative housing assignments,"[37] and thus could move away from Student

---

[36] Carleton contends "administrators were unable to identify the assailant based on the limited information shared."  D.M.4.  That is a classic jury question.  Carleton also ignores a contemporaneous CCF about the rape submitted after a report by another student.  S.App.242(CCF); n.34(quoting same).  Thornton testified no one ever followed up with that student to learn the assailant's name.  C.App.430(116).

[37] *Supra* (text accompanying n.28)(quoting policy requiring same).

One and the scene of the rape.[38]  Baggot instead testified it was not within his "role" to address the fact that Shank and her attacker were still living on the same dormitory floor.[39]  C.App.40-41(80-81).

Shank's friend ultimately suggested Shank should ask to move, an option Shank did not know was available.  C.App.370-71(94-95).  Shank moved in April 2012.[40]

---

[38] A jury could find Carleton's failure to remove Student One (or Student Two, *see infra*) from the same dormitory as Shank, standing alone, violated Title IX.  *E.g.*, *Doe v. Hamden Bd. of Educ.*, No. 3:06-CV-1680(PCD), 2008 WL 2113345, at *5 (D. Conn. May 19, 2008)(denying summary judgment on Title IX claim based on school's failure to expel rapist because "[f]urther encounters, of any sort, between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided to her at school").

Here, further encounters between Shank and the two rapists occurred because Shank continued to live in the same buildings as both rapists.  *Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 236 (D. Conn. 2009)(reasonable jury could find school's "failure to provide [victim] with specific accommodations following [assailant's] assault of her was unreasonable," including school's failure to remove the assailant from the school attended by victim); *Kelly v. Yale Univ.*, No. 3:01-cv-1591, 2003 WL 1563424, at *4 (D. Conn. Mar. 26, 2003)(denying summary judgment on Title IX claim where victim alleged her school failed to provide her with residential and academic accommodations following her assault).

[39] It is difficult to imagine whose role it would be if not that of the student deans. Baggot's disclaimer conflicts Carleton's policies defining its duties to ensure its students' health and safety.  C.App.411(Thornton 39-40)("one of [Carleton's] policies is to provide a safe campus for students"); C.App.557(SM Policy stating "Carleton…is committed to: fostering an environment free of sexual assault…maintaining a response to sexual misconduct that is comprehensive in scope, supportive in its approach, and fair in its execution"); S.App.246, 251-52(8/29/12 memorandum from Carleton's Sexual Misconduct Committee providing "[i]n every complaint of sexual misconduct, the college assesses the situation and makes accommodations, as appropriate, to ensure that the complainant is safe and protected" and "not adversely affected); C.App.547(Carleton's SM Policy requires Carleton "[t]o provide a safe campus for students").  Those policies clearly demonstrate Carleton's voluntary assumption of duties owed to Shank.  *Infra* (discussing voluntary assumption).

[40] Carleton nonetheless takes full credit for Shank's move:  "Baggot found Shank a single room in a different hall…."  D.M.5.  Carleton, however, ignored Shank's safety and its

The undisputed evidence that Carleton never offered Shank alternative housing upon learning her rapist lived on the same floor demonstrates Carleton's deliberate indifference/disregard of Shank's rights and safety and its negligence.

### F. Carleton's Mishandling of the Process against Student One Demonstrates Carleton's Deliberate Indifference/Disregard and Negligence.

#### 1. Carleton's SM Policy.

Carleton's SM Policy defined the procedures to address campus sexual misconduct, including the complaint process "by which the College investigates and adjudicates allegations of student-to-student sexual misconduct."[41]  The process began with the submission of a "complaint of sexual misconduct."[42]  "Complainant" was defined as "[a] **person** who makes a complaint of sexual misconduct."[43]  Carleton's written procedures at the time did NOT permit Carleton to initiate the formal complaint process, providing:  "The Office of the Dean of Students will follow up on concerns **but**

_____

own affirmative duties by waiting a number of months until Shank requested a move before doing anything.

[41] C.App.563.

[42] C.App.563.

[43] C.App.562(emphasis added).  Other definitions in Carleton's SM Policy demonstrate "person" means a human being, not an entity or institution.  *See id.* (respondent is "[a] **person** against whom a complaint of sexual misconduct is made")(emphasis added); *id.* ("complaint process coordinator" is "[a] **person** designated by the College to coordinate the complaint process and talk with students who are considering pursuing the complaint process")(emphasis added); *id.* (witness is "[a]ny **person** who may have information about the incident in question")(emphasis added).

Carleton nonetheless argues it was the "complainant," thus deprived Shank of her rights in the process.  D.M.8.  But Carleton failed to perform key tasks a complainant was supposed to do, like never submitting a "written complaint" against Student One, never submitting a written statement as complainant, C.App.440(Thornton 156-57), and never having a Carleton employee attend the hearing as "complainant."  C.App.444(Thornton 172); C.App.319(Mullen 133-34).  This is another material fact dispute.

**will not initiate the complaint process on behalf of a student**."[44]

The SM Policy also described written statements the complainant and the respondent were to prepare; the appointment of an investigator who would "meet with the complainant(s) and respondent(s) to gather facts about the incident" and prepare a written fact-finding summary, which was to be submitted to Carleton's Community Board on Sexual Misconduct ("CBSM").[45]

The CBSM hearing was to be conducted "to allow both the complainant and the respondent the opportunity to present their experiences, discuss the investigative summary, and to ask questions."[46]

### 2. Shank Was Too Afraid to Submit a CCF but Shank's Friend Did.

In April 2012, Shank learned Carleton had offered Student One a RA position for the following academic year.[47]  Shank and others were extremely concerned,[48] but Shank was too afraid of Student One to file a CCF in her own name, so on April 19, 2012, a friend submitted one naming Student One as the perpetrator of a rape.[49]

On May 1, 2012, Carlson was appointed Shank's SMS advisor.[50]

---

[44] C.App.562(emphasis added).
[45] C.App.563. The CBSM is:  "the College board of faculty, staff, and students charged with adjudicating complaints of student-to-student sexual misconduct."  C.App.564.
[46] S.App.254.
[47] C.App.58(Shank135-36).
[48] C.App.58-59(Shank 136-38).
[49] C.App.786(4/19/12 CCF); C.App.58-59(Shank 134-38; 140-41).
[50] S.App.255-56; C.App.142(61).

### 3.  Carleton Advised Shank in Writing about Shank's Purported Rights in the Process.

On May 1, 2012, Sillanpa, Carleton's sexual misconduct process coordinator, met with Shank.[51]  Shank confirmed she was raped and had now come forward because Carleton had offered Student One an RA position for the next year.[52]  Shank explained he had also gotten "pushy" with another student.[53]  Carleton never bothered to follow up to find out what happened to that second woman.[54]

Shank said she was still deciding whether to bring a formal complaint, C.App.572, a right belonging exclusively to Shank under Carleton's policies.[55]

Sillanpa reviewed and filled out with Shank Carleton's "Student Sexual Misconduct Complaint Process 1st Conversation Checklist" (the "Checklist"), which outlined the process and Shank's rights thereunder, indicating the goal was "to make the complaint process as thorough as possible."[56]  Sillanpa reviewed with Shank the items Sillanpa marked on the Checklist, and both then signed it.[57]

---

[51] C.App.61(147); C.App.348(85-86).

[52] C.App.572(Sillanpa 5/1/12 email to Thornton and Mullen reporting same); C.App.348(Sillanpa 85-86).

[53] C.App.572.  That Shank was equating her rape with Student One's treatment of another student ("pushy too") was clearly a red flag Carleton should have followed up on.

[54] C.App.309(Mullen 93).

[55] Carleton's policies provided and witnesses confirmed the victim must be the one in control of the sexual misconduct process.  S.App.257, 303(policies); C.App.432(Thornton 123-24); C.App.355(Sillanpa 117-18); C.App.216-17(Dunnewold 31-34).

[56] C.App.601-02(Checklist).

[57] C.App.433(129); C.App.602.  Carleton argues Shank did not participate because she "did not check any boxes indicating she was participating in the process."  D.M.6.  Who actually checked the boxes is irrelevant where it is undisputed that Shank signed the form.

Shank's rights on the Checklist included:  (1) an investigation with an investigator who gathered facts and would meet with the complainant and respondent; (2) a hearing "to allow both the complainant and the respondent the opportunity to present their experiences, discuss the investigative summary, and to ask questions"; and (3) an appeal "contingent upon participation in the investigative and hearing process."[58]

### 4.    When Proceeding against Student One for its Own Interests, Carleton Was Deliberately Indifferent to Shank's Rights.

On May 11, 2012, Carlson informed Sillanpa Shank was still deciding whether to proceed and "definitely need[ed] space to make her decision."[59]  But less than three weeks later, Carleton held a hearing regarding Student One, *infra* (discussing hearing) thereby wresting all control from Shank[60] before she made any decision.[61]  Carleton witnesses testified Carleton initiated the hearing process because **Carleton** wanted a

---

[58] C.App.601.  Carleton argued that Shank had no appeal right because she did not participate (not a "party").  D.M.11.  But Carleton witnesses disagreed about what "participation in the process" meant for purposes of an appeal, with Carlson testifying Shank's written statement constituted participation, C.App.151(99-100), while Thornton claimed Shank did not participate because she never attended the hearing. C.App.440(157-58).  Back then, Carleton used Shank's "nonparticipation" as justification for denying her requests both to attend the hearing or appeal.  C.App.68-69(Shank 175-180).  There is a material fact dispute about whether Shank wanted to attend the hearing.
      Carleton's refusal to let Shank appeal because she was not the "complainant" violated the Clery Act, under which the right to appeal belongs to the **victim**.  20 U.S.C. §1092(f)(8)(B)(iv)(III)(bb)(colleges must have written procedures allowing "the accused and **the victim to appeal the results** of the institutional disciplinary proceeding")(emphasis added).
[59] S.App.325(5/11/12 email from Carlson to Sillanpa).
[60] *See* n.55(victim must control process).
[61] C.App.439-40(Thornton 154-55); C.App.311-12(Mullen 104-05, 108)(Carleton had decided to move forward by May 7th, and if Shank had asked at that point if she could bring her own complaint in the fall 2012, Carleton would have said no); C.App.63(Shank 157).

procedure to **protect itself** when taking away Student One's RA position.[62]

Contemporaneous emails confirm Carleton's focus on its own interests to Shank's detriment.  On May 1, 2012, after Sillanpa and Shank met and completed the Checklist, Sillanpa sent an email to Thornton and Mullen making clear Sillanpa's real concerns: "Okay, now I'm freakin' out… the potential respondent is someone we hired to be an RA next year!!!!"[63]  On May 1, 2012, Mullen emailed Thornton:  "I'd really like us to move forward on this, if indeed [Shank] decides not to do anything and especially in light of the RA situation."[64]  Mullen also asked the others NOT to tell Shank that Carleton was planning to move forward with or without Shank.[65]

Carleton pressed ahead even though its witnesses conceded there was no need to conduct a hearing so quickly.[66]  And without any written policy to address the situation,[67] Carleton also decided to exclude Shank from any meaningful role in the process and was thus deliberately indifferent to Shank's rights.[68]  Indeed, Thornton admitted Carleton was

---

[62] C.App.142(Carlson 62); C.App.432(Thornton 124-25).  Sokolow testified that Carleton needed no procedure to do that, and he had taken away RA positions with no hearing "for dozens of colleges."  S.App.685(Sokolow Dep. 100).

[63] C.App.572(5/1/12 Sillanpa email).  Sillanpa's "freakin' out" exclamation makes sense because she was responsible for the RA program and would have participated in offering Student One a position.  S.App.329; S.App.330-32; C.App331(Sillanpa 10).

[64] S.App.333-34.

[65] C.App.573.  Carleton argues that it only "deferred telling Shank" about the hearing because they wanted to let her decide whether to pursue a complaint.  D.M.6.  Carleton's rationalization is questionable because the hearing was held less than five weeks later. That is a classic jury question.

[66] S.App.194(Carlson 27); C.App.548(training materials indicating no time limit for victim may bring claim); C.App.434-35(Thornton 133-37).

[67] C.App.432(Thornton 123-24).  Thornton confirmed Carleton at that time had no written policy to address the situation.  C.App.420(77-78).

[68] Carleton argues it was merely reacting to Shank's indecision, D.M.6, ignoring its own

"making it up" as it went along.[69]  Carleton never informed Shank of the rights Carleton would (and did) take away if Shank did not file a complaint herself, including all the rights on the Checklist.  *Supra.*

Carleton did insist on one thing from Shank:  a written statement.[70]  But Carlson submitted it to the CBSM knowing it was incomplete[71]

There is other evidence of Carleton's wrongdoing:  Carlson, on her own initiative

---

admissions that victims needed time to process, C.App.511-12(Williamsen 66-67), should have complete control of the procedure, *see* n.55, and regularly changed their minds, C.App.223-24(Dunnewold 68-69), perhaps in two minutes, 24 hours, or years later.  C.App.408(Thornton 28-29).

[69] C.App.444(173-74).

[70] S.App.340(Mullen's 5/14 notes of Carlson call indicating ████████ ██████████ Carleton takes aim at Shank for "purposefully" removing from her statement "details she worried might get Student One expelled" and arguing she did not want him suspended or expelled. D.M.8, 9 n.6, 27.  Shank knew that Student One would read her statement and she did not want to openly request his expulsion because she was afraid of him. C.App.72(190)(testifying "the issue was him knowing that I got him expelled"); C.App.65(163)("I was afraid of him"); C.App.67(170)("what I wanted was for him to get expelled, but I didn't want him to think that I was the reason he got expelled…I didn't want to have a target on my back").  Moreover, Carlson had assured Shank that her draft already had enough information. C.App.65(163-64); C.App.685; S.App.345(Mullen 5/21/12 email stating Shank's statement was "thorough and good job").  Shank thus thought she did not need to request his expulsion in her statement (and risk his anger) because it was going to happen in any event.

[71] C.App.679(5/18/12 Shank email to Carlson "[h]ere is what I have so far in terms of a statement; I'm finding myself kind of stuck"); C.App.608(5/18/12 Carlson email to Thornton and Mullen stating "Shank has submitted a draft of her statement."); S.App.346(5/21/12 email from Carlson to Thornton indicating that Shank might add more to her statement "but I believe she is still processing"); S.App.347(5/21/2012 Carlson email to Shank stating "I have submitted your statement to Joann[e] Mullen as is").  There is a material fact dispute about whether Carlson told Shank there was enough information in Shank's incomplete statement to get Student One removed from campus. *Compare* C.App.143(Carlson 65) *with* C.App.65(Shank 163-64).  Carleton's counsel conceded this fact dispute.  *See infra.*

and without the requisite expertise,[72] suggested to the CBSM panel that Shank wanted a

"mediated conversation" with Student One (Carlson's idea, **not** Shank's);[73] Mullen, the

investigator, never bothered to interview Shank;[74] Carleton did not let Shank see Student

One's written statement before or after the hearing;[75] Carleton refused to allow Shank to

participate in the hearing,[76] to appeal or to appeal itself on her behalf;[77] failed to sanction

Student One by suspending or expelling him as they had other students who had violated

the SM Policy in the same way;[78] refused to disclose all of the sanctions to Shank;[79]

---

[72] C.App.515(Williamsen 89-90); *infra* (discussing Carlson's inexperience in greater detail).

[73] C.App.154-55(Carlson 111-13); C.App.688-89(Carlson's submission to the CBSM). Although Carleton's counsel claims this issue is a fact dispute, *infra*, it is not. **CARLSON** readily admitted the "mediated conversation" was **HER** idea. C.App.154(Carlson 113).

[74] C.App.312(Mullen 106).

[75] C.App.68-69(175-78); S.App.348-49 (emails indicating Carleton would not allow Shank to see Student One's statement). Student One was allowed to review and respond to Shank's written statement. C.App.314(Mullen 114). Wagner testified, however, that Shank **was** entitled to read Student One's statement under Carleton's SM Policy. C.App.493(Wagner 119); C.App.151, 156(Carlson 100, 118-19). If Shank had been allowed to see Student One's outright denials, she would have provided greater detail regarding the circumstances of the rape and its violence. C.App.68(175-77).

[76] C.App.68(Shank 176).

[77] S.App.350-51; n.58(**victim** has appeal right under the Clery Act).

[78] Carlson testified Student One's sanctions were **not** commensurate with those of other students with similar violations. C.App.152(103-04); S.App.352(Carleton 2012 report revealing the suspension of two other students who had violated Carleton's SM Policy during the same time frame as Student One).

[79] C.App.313(Mullen 110-12)(Shank could not be told all the sanctions). Carleton used its mistaken refusal to ultimately force Shank into the terrible one-on-one meeting with Student One. *See infra*. Carleton argues that it was its practice to share with the victim only those sanctions which directly related to the victim. D.M.13 n.8. Carleton, however, was legally required to disclose the sanctions and violated those requirements. *See* n.108.

failed to enforce some of the sanctions against Student One;[80] and failed to issue Student One's written no-contact order for more than four months after the hearing.[81]

The foregoing illustrates material fact disputes regarding Carleton's deliberate indifference/disregard of Shank's rights and safety and its negligence.  Indeed, then Dean of Students Wagner testified Carleton should have allowed Shank to participate in the process.  C.App.493(118-19).[82]

On May 30, 2012, the panel held Student One's hearing and determined he violated Carleton's SM Policy.  C.App.575.  The panel neither suspended nor expelled Student One.  *Id.*  Carlson admitted Student One should have been suspended like other students found to have committed sexual assault.[83]

The panel instead took away Student One's RA position (accomplishing Carleton's goal) and imposed other minor sanctions.  C.App.575.  By letter dated May 31, 2012, Carleton informed Student One of the sanctions and warned him ███████ ████████████████████████████████████████████████  C.App.576.

Carleton's wrongdoing deprived the CBSM of critical information on which to

---

[80] ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████  S.App.356, 357; *cf.* C.App.438(Thornton 150)(testifying Carleton did not "police" Student One's compliance with alcohol prohibition).

[81] C.App.634.

[82] Wagner was unaware of those events at the time because she handled all appeals and thus was walled off from the underlying process against Student One.  C.App.480, 483 (66-67, 80).

[83] C.App.152(Carlson 104).

make an appropriate sanctions decision.[84]  The CBSM never learned about the violence of the first rape (because of Shank's incomplete statement and Mullen's failure to investigate) or that Student One had gotten aggressive with another woman, as Shank had earlier disclosed to Sillanpa.[85]

In his interview with Mullen, Student One also disclosed .[87]  Carlson testified, however, that if she had known how violent Student One's rape was, Carlson would have insisted Shank participate in the process because that information "changed it from a he-said/she-said first-time encounter with sex and alcohol to a violent, almost premeditated rape, and that's very different to me."[88]

Indeed, when Wagner learned in 2015 about the violence of the first rape, she testified:  "thinking about just [Shank's] fear and responding to…this articulation that having him on campus was impacting her psychologically, was frightening."[89]

---

[84] Carlson testified that if the CBSM had known how violent the rape was, the outcome would have been different.  C.App.171(177-78).

[85] See C.App.572.  It was particularly egregious that no one bothered to inquire about that second woman, supra nn.51-53 & accompanying text, or even inform the panel of her existence.

[86] C.App.611-12(Mullen's summary of her interview with Student One, submitted to the CBSM but never shown to Shank).

[87] Those facts show violations of Carleton's policies to ensure the health and safety of its students.  Supra n.39(quoting Carleton's policies requiring same).  Thornton confirmed that "one of [Carleton's] policies is to provide a safe campus for students." C.App.411(39-40).

[88] S.App.227(178).

[89] C.App.487(94).  In 2015, after learning of the violence, Wagner reinstated the no-contact order.  S.App.370.  When Student One complained, his SMS advisor informed

IV.   **CARLETON WAS DELIBERATELY INDIFFERENT TO SHANK'S RIGHTS AND SAFETY BY FORCING THE SO-CALLED "MEDIATED" MEETING.**

The meeting between Shank and Student One on October 15, 2012 is a particularly blatant example of Carleton's deliberate indifference/disregard for Shank's rights and safety.  Judge Schiltz called out the meeting as an allegation that, if true, demonstrated Carleton acted with deliberate indifference sufficient to support Shank's Title IX claim.[90]

A.   *The Panel Ordered the Meeting as a Sanction for Student One Because Carlson Misled It.*

In May 2012, Shank expressed her wish for "closure" during meetings with Carlson before the hearing for Student One.[91]  Carlson admitted she then came up with the notion this "closure" could be achieved if Shank met with Student One.[92]  Carlson thus informed the CBSM (**without** Shank's knowledge or permission) that closure "could be in the form of a mediated conversation between [them] concerning the nature of future interactions at Carleton."[93]

---

him: ████████████████████████████████████████████
████████████████████████████████████████

S.App.371.

[90] *Shank*, 232 F. Supp. 3d at 1110.  Judge Schiltz also ruled the allegation sufficient to support Shank's IIED claim.  *Id.* at 1114.

[91] C.App.153-54(Carlson 108-09).

[92] C.App.154-55(Carlson 111-14).  Although Carleton argues the meeting was Shank's idea, D.M.13-14, Carlson clearly testified it was **HER** idea Shank could obtain "closure" by meeting with Student One.  C.App.155(113:1-10).  Shank testified consistently with Carlson.  C.App.68(174).

[93] C.App.688-89(materials Carlson submitted to CBSM).  Carleton argues Shank agreed to the mediated conversation because Shank never corrected Carlson's statement to the CBSM.  D.M.10.  The DCL made clear, however, that such meetings are not appropriate in sexual assault cases even if voluntary.  *See supra*.  The Court should thus reject this argument.

24

Mediated conversations, however, should not be used in cases of sexual assault. The April 4, 2011 "Dear Colleague Letter" from the Civil Rights Office of the U.S. Department of Education ("DCL") provided: "it is improper for a student who complains of harassment (this includes sexual assault and rape) to be required to work out the problem directly with the alleged perpetrator."[94]  In cases of sexual assault, such a meeting "is not appropriate **even on a voluntary basis**."[95]

Moreover, Carlson was not qualified to suggest a mediated conversation in the first place.[96]  Carlson admitted that before Shank, Carlson had never seen a mediated conversation used in sexual assault cases, just for matters like roommate disputes.[97]  And no one personally involved in the process against Student One was trained to facilitate a restorative justice process.  At that time, Williamsen was the only Carleton employee qualified and she was neither consulted nor played any other role in the events leading up to the meeting between Shank and Student One.[98]

---

[94] S.App.413, 420(DCL); *accord* Koss Decl. Ex. 1 at 9-12.

[95] S.App.420(DCL)(emphasis added).  Restorative justice should thus not be used in sexual assault cases.  Even in appropriate situations, a mediated conversation should not be conducted in private, even if requested by one or both participants.  An unmoderated meeting is not considered a safe or accepted practice, S.App.570-71(Koss Dep. 96-97), which would be even more true in sexual assault cases.

[96] S.App.436, 440(Koss Dep. at 96, 106)(Shank expert witness testifying that in her opinion, Carlson lacked necessary training to advise sexual assault victims).

[97] C.App.154(111-12); C.App.447(Thornton 184-85)(same).  Williamsen, the only one qualified in restorative justice, testified she had never been involved in the use of a mediated conversation when a student had been found to be in violation of Carleton's SM Policy.  C.App.518(108-10).

[98] C.App.515(Williamsen 89-90).

Despite the foregoing, the CBSM, mistakenly believing the idea was Shank's,[99] imposed a mediated conversation with Shank as one of Student One's sanctions.[100] Carleton then coerced Shank to meet with Student One.

### B.     Carleton Coerced Shank into Meeting with Student One.

In early October 2012, Shank learned Carleton had suspended two other students who violated the SM Policy in the same way as Student One after reading Carleton's spring 2012 Report on Sexual Misconduct (the "Report").[101]

Shank was extremely upset by the unequal sanctions[102] and that she kept seeing Student One around campus (which she did not understand because of the no-contact order).[103]  Shank, for her safety and peace of mind, desperately wanted to learn about all the other sanctions[104] because Mullen had told Shank's mother that if Student One violated even one sanction, he would be "out."[105]

---

[99] Virtually everyone involved believed–incorrectly–that the idea was Shank's. C.App.447(Thornton at 183-84); C.App.317(Mullen 126-28).  Such meetings are NOT appropriate even if the victim wants one.  *Supra* nn.94-95 & accompanying text.

[100] S.App.441-42(10/4/12 email from Thornton to Shank indicating same).

[101] S.App.352(Report).

[102] S.App.447(Shank email); S.App.448(10/3/12 email from Vickie Shank to Mullen indicating the Shanks' anger about the Report, the disparate sanctions, and Carleton's refusal to appeal).  A college's failure to sanction appropriately is one indicia of deliberate indifference.  *E.g.*, *S.S. v. Alexander*, 177 P.3d 724, 739 (Wash. Ct. App. 2008)(reversing summary judgment on Title IX claim and collecting cases holding an institution's "failure to meaningfully and appropriately discipline the student-harasser is frequently seen as an indication of deliberate indifference").

[103] The no-contact order was one of the few sanctions Carleton told Shank about. C.App.72(Shank 192-93); C.App.383-84(V. Shank 150-51).

[104] C.App.73-74(Shank 195-98).

[105] C.App.381(V. Shank 140-42)(testifying Mullen said "one violation and, quote, he would be out"); C.App.796(Mullen memorandum confirming same).

On October 5, 2012, Shank met with Thornton to learn about the sanctions and why she kept seeing Student One.[106]  The college had just issued Student One's written no-contact order the day before,[107] more than four months after the hearing.

Thornton also claimed the only way Shank could learn about the other sanctions was to meet with Student One because federal law prohibited Carleton from disclosing them.[108]  Shank was desperate to have Student One removed from campus,[109] and believed he would be expelled if he violated a sanction (relying on Mullen's statement to Shank's mother, *supra*).[110]  Shank was thus coerced into the meeting.[111]

---

[106] C.App.73-74(Shank 195-99); C.App.384(V. Shank 153-54).

[107] C.App.634-35(10/4/12 email from Thornton to Student One with attached no-contact order).

[108] C.App.74(Shank 199-200); C.App.702(Thornton email telling Shank Carleton was prohibited from disclosing sanctions because it must "protect his private student record"). **THAT IS FALSE**.  The law requires such disclosure, 20 U.S.C. §1092(f)(8)(B)(iv)(III)(aa), and provides such disclosures do **not** violate FERPA.  34 C.F.R. §668.46(k)(3)(iv); *id.* §668.46(l).

[109] Running into Student One after returning for her sophomore year convinced Shank she could not function on campus if he were there too.  C.App.73(Shank 197-99).  Not surprisingly, on September 22nd, a CCF was submitted indicating Shank was ███████ ████████████████████████████  C.App.669(9/22/12 CCF).  Carlson met with Shank about this CCF on September 24th.  C.App.700.

[110] C.App.73-76(Shank 197-98, 205-06); C.App.381(V. Shank 140-42); C.App.164(Carlson149-50).  Thornton also told Shank Student One was remorseful. C.App.74(Shank Dep. 199-200).

[111] C.App.75-76(Shank 205-06).  Carleton blames Shank for the meeting because Shank wrote up guidelines for it and her therapist and mother discouraged it.  D.M.13.  Carleton ignores its own involvement in pushing the meeting.  S.App.443(Carlson 10/10/12 email to Student One stating ███████████████████████████████████ ████████████████).  Shank thus trusted the wrong people, the two Carleton folks pushing it, Thornton and Carlson, C.App.75(Shank 205), rather than her mother and therapist. Such trust in the institution is a cornerstone of institutional betrayal.  Jennifer Freyd & Pamela Birrell, *Blind to Betrayal* 38-40 (2013).

Carleton also violated key principals of restorative justice, thereby creating a "dangerous" situation, for example, by having Shank prepare guidelines, by failing to

### C.   The "Disastrous" Meeting.

On October 15, 2012, Shank met with Student One in Thornton's office.[112]

Thornton was not present, but Carlson was in the next office.[113]  The meeting with

Student One was terrifying and disastrous for Shank.[114]  Shank froze, as she had during

the rape, and was unable to knock on the office wall to summon Carlson.[115]

Student One neither apologized nor expressed any remorse, instead telling Shank

how hard it was on him and how angry he was with **her**.[116]  He pressured Shank to agree

to lift the no-contact order. [117]  Shank was terrified, so she agreed and left a post-it note

on Thornton's desk indicating the order could be lifted.[118]

No one from Carleton ever bothered to follow up to ask Shank why she had agreed

---

meet with and prepare Student One before he actually met with Shank, S.App.573(Koss
Dep. at 99); by failing to take into account Shank's extremely fragile condition at that
point, *id.* ("that's an absolute no-no"); and the absence of a moderator, *id.* 570-71(96-
97)(a "dangerous process"), all misconduct which clearly contributed to the "disastrous"
meeting. *Supra* n.25(quoting Dr. Freyd); *infra* n.141 & accompanying text(9/22/12 CCF
disclosing Shank's ███████████).  On this record it is for the jury to determine the
issue of coercion.
[112] C.App.76(Shank 207).
[113] C.App.76(Shank 207-08); C.App.164(Carlson 149-50).
[114] C.App.76(Shank 208-09).
[115] C.App.76(Shank 207-08).  Carleton's sexual misconduct training materials
acknowledged common responses to sexual assault:
> **'Freezing' during a traumatic event is common**
> •Not fighting back
> •Not saying 'no'
> •Disassociation
S.App.257, 299(emphasis in original).
[116] C.App.76(Shank 208-09).
[117] C.App.76(*id.*).
[118] C.App.76(*id.* 207-09).

to this or whether the action was in her best interests.[119]  Thornton merely responded by stating that lifting the no-contact order was "a very easy thing to do."[120]

Ironically, after refusing to allow Shank any control regarding the hearing, Carleton now gave her complete and unquestioned control over the elimination of the principal sanction imposed on her assailant.

Shank thereafter felt even more threatened, terrified she might run into Student One any time any place on the campus.[121]  Shank did run into him throughout her remaining tenure at Carleton, and as a result, routinely stayed away from her classes because she could not bear seeing him.[122]

## V.   CARLETON WAS DELIBERATELY INDIFFERENT TO SHANK'S RIGHTS AND WAS NEGLIGENT AFTER THE SECOND RAPE.

On April 6, 2013, Shank, now a sophomore, was raped by Student Two, a senior student living in Shank's dormitory.[123]  On April 24, 2013, Shank and three other female students submitted CCFs about Student Two.[124]  Shank reported Student Two had raped her, and all four students reported Student Two was ███████   ███████████

---

[119] C.App.456(Thornton 221); C.App.166(Carlson 158-60).
[120] S.App.449(10/16/12 Thornton email).  Carleton's complete lack of follow up is again consistent but troubling.  C.App.393(V. Shank 189-90).
[121] C.App.92-93(Shank 271-74).
[122] C.App.77, 92-93(Shank 211, 271-74); S.App.245(3/6/15 incident report explaining Shank's avoidance of classes to avoid Student One).  This is prime evidence of Shank's unequal access to educational opportunities.  *See infra* (discussing same). Carleton argues Shank was "hanging out" with Student One years later.  D.M.34 n.16.  That is not true. The Facebook messages Carleton cites demonstrate just the opposite.  C.App.864█████████████████████████).
[123] C.App.77(Shank 211-12).
[124] S.App.450-57(Dep. Ex. 203)(students' CCFs and related emails).

████████████████████.[125]  Carlson submitted a CCF confirming the four

women had reported Student Two was ██████████████████[126]  Carlson also

emailed the four women, claiming that ████████████████████████[127]

Despite Carlson's claim, Carleton did little about Student Two, issuing a no-

contact order pertaining to the four students who filed CCFs, and having Baggot speak to

Student Two.[128]  But Carlson told Shank not to file a formal complaint because Student

Two was graduating in two months and Carleton could not do anything else.[129]

Carlson told Shank to focus instead on her school work because Shank was in

danger of academic suspension,[130] and if Shank could not handle staying on campus with

Student Two there, she should take medical leave or change to an easier major.[131]

Carlson's suggestion that Shank should leave school rather than having Carleton take

steps to remove Student Two is sufficient, standing alone, to demonstrate Carleton's

deliberate indifference.[132]

---

[125] S.App.450-54.

[126] S.App.454-55(Carlson's CCF).

[127] S.App.456(Carlson 4/25/13 email).

[128] S.App.455-56.

[129] C.App.79(Shank 220-21).  There is a material disputed fact about whether Carlson told Shank this.  Carleton also minimizes the second rape and argues Shank did not want anything to happen to Student Two.  D.M.16.  That is neither true nor the standard by which Carleton must respond to sexual assaults.

[130] There are numerous other examples of Carleton's deliberate indifference/disregard of Shank's rights and safety in the academic arena as well as its failure to make other accommodations required by the ADA.  Some of those examples are set forth *infra*, in the discussion of Shank's ADA claim.

[131] C.App.79(Shank 220-21).

[132] *E.g.*, *Doe v. Dallas Indep. Sch. Dist.*, No. 3:01-CV-1092, 2002 WL 1592694, at *6 (N.D. Tex. July 16, 2002)(denying motion to dismiss Title IX claim because the school separated victim from assailant by barring victim, not assailant, from gym class).

## LEGAL ARGUMENT

### I.   CARLETON'S COUNSEL CONCEDED FACT DISPUTES.

Carleton's counsel admitted fact disputes in several areas.  For example, he noted fact disputes between Shank's and Carlson's testimonies regarding the process Carleton commenced against Student One, including:  to what extent Shank wanted to be involved in the hearing, S.App.848-49(Freyd Dep. 88-89); whether Shank had been barred from participating in the hearing or appealing, S.App.680-81, 707(Sokolow Dep. 95-96, 122); whether Carlson told Shank that her incomplete statement was sufficient to get Student One removed from campus, S.App.851(Freyd Dep. 91); and whether Shank "disclosed any aspect of violence in connection" with the rape by Student One.  S.App.564(Koss Dep. 90).

Carleton's counsel also admitted (in depositions and at the hearing on Shank's motion to amend to add punitive damages) a fact dispute regarding whether it was Shank or Carlson who requested a mediated conversation.  9/11/18 Hearing Tr. at 35; S.App.712(Sokolow Dep. 127)(counsel claiming "considerable fact dispute").

Carleton's counsel further admitted there were factual disputes about Carleton's response to the report of a sexual assault by Student Two.  S.App.678-79(Sokolow Dep. 93-94)(counsel identifying fact dispute about whether Carlson discouraged Shank from coming forward and pursuing a formal process against Student Two); S.App.718-19

---

Carleton's decision to permit Student One to attend graduation even though Shank had informed them she could not bear to attend if he did, C.App.91-92(Shank 269-70), is another example of Carleton's deliberate indifference/disregard in this area.

(Sokolow Dep. 133-34)(counsel noting "strong dispute" regarding evidence that Carlson told Shank not to file a complaint against Student Two because he was about to graduate).

Counsel's admissions, standing alone, preclude the grant of summary judgment.

## II.    THE COURT SHOULD DENY SUMMARY JUDGMENT ON SHANK'S TITLE IX CLAIM.

Judge Schiltz summarized Shank's Title IX allegations as follows:

> Shank alleges that Carleton failed to advise her of her procedural and substantive rights; wrongfully denied her the ability to participate in the adjudicatory hearing against Student One; discouraged her from pursuing a formal complaint against Student Two; took only minimal action against her assailants; coerced her into a one-on-one meeting with Student One (who then took the opportunity to pressure her into lifting the only sanction of which she was aware); and did not even enforce the minimal sanctions that it had imposed.

*Shank*, 232 F. Supp. 3d at 1110.[133]  Judge Schiltz held that the foregoing allegations, if true, demonstrated Carleton's deliberate indifference sufficient to support Shank's Title IX claim.  *Id.*  Substantial evidence proves that these, and other allegations, are true:[134]

1.    Its refusal to provide Shank with a token to a local hospital to get a rape examination, discouragement of Shank from obtaining a rape exam, minimization of Shank's immediate emotional reaction to the incident, failure to advise Shank about housing alternatives, and suggestion that she talk to the assailant;

2.    Its failure to follow up with Shank after receiving several warning signs about her between September 2011 and February 2012;

3.    Its failure to remove the Student One Posters after Shank explained

---

[133] The Court's summary of the allegations quoted above also applies to Shank's negligence claim.  *Shank*, 232 F. Supp. 3d at 1110.

[134] Carleton is left laying out its own version of these material facts, thus showing beyond a doubt there are material fact disputes precluding the relief it seeks.

32

they made her ███████;

4.      The undisputed evidence that Carleton never offered Shank alternative housing upon learning Student One lived on the same floor;

5.      Its initiation of the hearing against Student One for its own reasons while it knew Shank was still deciding, thus preempting her right to do so, coupled with its complete failure to advise Shank about the rights Carleton (unnecessarily) took away as a result of its hurried, unilateral decision;

6.      Its investigation misconduct, including the investigator's failure to interview Shank, the lack of further investigation regarding the report of Student One's pushiness with another ███████████ ███████, and the refusal to allow Shank to see Student One's written statement;

7.      Its knowing submission of and reliance on Shank's incomplete written statement;

8.      Its refusal to disclose all of Student One's sanctions to Shank, explaining to her, incorrectly, that such disclosure was barred by law, when the law actually required it;

9.      Its refusal to appeal or allow Shank or her family to appeal, the minimal sanctions imposed on Student One;

10.     Its refusal to enforce Student One's sanctions;

11.     Its delay in issuing a written, no-contact order against Student One for more than four months after the hearing;

12.     Its imposition of a sanction on Student One requiring him to have a mediated conversation with Shank;

13.     Its coercion of Shank into meeting with Student One by telling her the only way Shank could learn about his other sanctions was to meet with him, which, as Judge Schiltz noted, resulted in Student One pressuring her into lifting the no-contact order;

14.     Its failure to suspend or expel Student One or Student Two or even

to move them from the same dorm; and

15.    Its refusal to take any other meaningful action against Student Two
       because he was graduating in several months.[135]

This evidence supports a denial of Carleton's summary judgment motion on

Shank's Title IX claim.  *E.g.*, *Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 233 (D.

Conn. 2009)(denying summary judgment on Title IX claim because the "mere fact that

[victim and attacker] attended school together [after the attack] could be found to

constitute pervasive, severe, and objectively offensive harassment so as to deny [victim]

equal access to school resources and opportunities"); *Takla v. Regents*, No. 2:15-cv-

04418-CAS(SHx), 2015 WL 6755190, at *6 (C.D. Cal. Nov. 2, 2015)(finding plaintiff's

assertions that the university discouraged plaintiff from requesting a formal investigation,

violated its own policy in its proceeding against the assailant, failed to provide plaintiff

with a formal investigation report or written outcome of the proceeding, and took other

actions in violation of its own policies, taken as a whole, sufficiently alleged deliberate

indifference); *Lilah R. v. Smith*, No. C 11-01860 MEJ, 2011 WL 2976805, at *5-6 (N.D.

Cal. July 22, 2011)(denying motion to dismiss Title IX claim based on school district's

denial of deliberate indifference, despite plaintiff's concessions that the district

investigated her claim, put counselor who sexually harassed her on leave during the

investigation, found counselor engaged in inappropriate conduct, considered plaintiff's

appeals and took some steps to limit her contact with the counselor, because plaintiff also

---

[135] Many of these facts also demonstrate Carleton's "institutional betrayal" of Shank.
Freyd Decl. Ex. 1 at 12-18.

34

alleged the investigation took longer than the time permitted under the district's policy, the district failed to inform student of the steps it would take to limit counselor's future contact in its letter notifying her of the investigation's outcome, and it also failed to take adequate steps to limit or prevent any future contact by refusing to transfer or fire counselor but instead merely assigning him to a different floor of the school); *Hamden Bd. of Educ.*, 2008 WL 2113345, at *5 (denying summary judgment on Title IX claim because school did not expel rapist and additional encounters with victim could deprive her of access to educational opportunities).

These cases undermine Carleton's argument that its deliberate indifference/disregard did not deprive Shank of access to educational opportunities. D.M.27-28.  "[E]ven a single incident of rape is sufficient to establish that a [victim] was subjected to severe, pervasive, and objectively offensive sexual harassment for purposes of Title IX." *Lopez v. Metro. Gov't*, 646 F. Supp. 2d 891, 913 (M.D. Tenn. 2009).[136]

Carleton also argues that Shank's Title IX claim fails because she is not entitled to any particular remedial measure.  D.M.23-24.  The Court should first reject that argument because Judge Schiltz has already established the allegations about remedial measures (or lack thereof) that, if true, would demonstrate Carleton's deliberate indifference/disregard. *Shank*, 232 F. Supp. 3d at 1110.

Moreover, although victims may not be entitled to a particular remedy, courts have

---

[136] Courts have also "found that when otherwise non-actionable conduct follows an act of sexual assault, such conduct increases in severity." *S.G. v. Rockford Bd. of Educ.*, No. 08 C 50038, 2008 WL 5070334, at *3 (N.D. Ill. Nov. 24, 2008).

routinely found a minimal sanction and/or the failure to remove a rapist from a campus or school is evidence of deliberate indifference. *Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 444 (D. Conn. 2006)(denying summary judgment on Title IX claim because a reasonable jury could conclude that allowing assailant "to continue attending school in the same building as [the victim] after the assault, leaving open the constant potential for interactions between them" constituted "severe, pervasive, and objectively offensive" harassment); *S.S. v. Alexander*, 177 P.3d 724, 739 (Wash. Ct. App. 2008)(reversing summary judgment on Title IX claim and collecting cases holding institution's "failure to meaningfully and appropriately discipline the student-harasser is frequently seen as an indication of deliberate indifference"); *C.S. v. S. Columbia Sch. Dist.*, No. 4:12-CV-1013, 2013 WL 2371413, at *10 (M.D. Pa. May 21, 2013)(school "had a remedial duty under Title IX to take some action to try to prevent further harassment"); *see* cases cited *supra* (*Hamden, Kelly*).

The Court should thus deny summary judgment on Shank's Title IX claim.

## III.   THE COURT SHOULD DENY SUMMARY JUDGMENT ON SHANK'S NEGLIGENCE CLAIM.

Judge Schiltz, when declining to dismiss Shank's negligence claim, noted that claim included allegations regarding Carleton's "negligently responding to the rapes." *Shank*, 232 F. Supp. 3d at 1111. The topics listed above regarding Carleton's deliberate indifference responding to Shank's rapes also support Shank's claim that Carleton was negligent in its responses.

Sokolow testified regarding many of those issues including:

36

- Carleton should have left Shank alone and not conducted a formal hearing process against Student One and its conduct of the process did not meet industry standards.  S.App.693(108).

- Carleton worked through way too many administrators in dealing with the rapes.  The standard of care is clear and requires one person with Title IX responsibilities should have overseen and dealt directly with the rapes. S.App.705-07(120-22).

- It was improper for Carleton to facilitate the one-on-one meeting as it did. S.App.709(124).

- Carleton did not act within the standard of reasonable care after receipt of the Jueds Report (addressing Carleton's wide-spread condonation of underage drinking).  S.App.733-34(148-49).

Carleton contends the claim fails because it is not responsible for the conduct of third parties and Shank's harm was not foreseeable.  D.M.30-33.  As to third parties, this Court recently recognized that "colleges of today…are expected to ensure a healthy and safe living environment."  *Doe v. University of St. Thomas*, No. 16-1127, 2019 WL 802740, at *5 (D. Minn. Feb. 21, 2019).  Various Carleton witnesses testified, and Carleton policies make clear, that Carleton voluntarily assumed the duties to keep its students safe and to provide sexual assault victims with various accommodations and specific rights in a process as detailed above.  *Supra* nn.28, 39, 41-46 & accompanying text to those notes.

Carleton also owed Shank duties as a result of the "unique relationship" between a college and its students.  *University of St. Thomas*, 2019 WL 802740, at *5 (holding that because of "unique relationship" between private university and its students, the university owed a common law "duty of reasonable care" to its students); *Mullins v. Pine Manor College*, 449 N.E.2d 331, 336 (Mass. 1983)(affirming jury verdict in favor of

student raped on campus by a third party because college, in exchange for tuition, voluntarily assumed the duty to protect its students as "an indispensable part of the bundle of services which colleges . . . afford their students" and "a duty voluntarily assumed must be performed with due care").

As to foreseeability of harm, courts have routinely held rape is foreseeable when it occurs as here, i.e., in dorm rooms on campus. *E.g.*, *Brown v. Delta Tau Delta*, 118 A.3d 789, 793 (Me. 2015)("Over a decade ago, we recognized that sexual assaults could foreseeably occur in a dormitory room on a college campus."); *Stanton v. Univ. of Me. Sys.*, 773 A.2d 1045, 1049-50 (Me. 2001)(reversing summary judgment that was based on finding college owed no duty because "a duty founded on premises liability exists between a student and a college" where fraternity member sexually assaulted student in her dormitory room after he walked her back there after meeting her at a frat party).

Carleton's arguments also ignore the fact that Shank's overarching negligence claim is that Carleton is liable **FOR ITS OWN CONDUCT** and that conduct directly caused Shank's serious, long-lasting harm, including both emotional and physical injuries. Judge Schiltz's opinion, however, principally discussed a negligent infliction of emotional distress claim based on Carleton's response to the rapes, *Shank*, 232 F. Supp. 3d at 1111, and volunteered, but did not hold (because he noted the issue was not before him) that the law might require more than emotional injury. *Id*.

Carleton thus argues Shank's negligent infliction of emotional distress claim fails because Carleton neither inflicted nor risked inflicting physical injuries on Shank because it issued no-contact orders. D.M.33-34. Carleton ignores evidence the no-contact orders

were ineffective[137] and that its own actions in coercing Shank into meeting with Student One resulted in the lifting of his no-contact order only two weeks after it was finally issued. *Supra*. Issuing a no-contact order against Student Two while Shank was still living in the same dormitory was but a meaningless gesture.

Carleton also ignores evidence showing Shank suffered substantial mental, physical and emotional harm as a result of its own negligence.[138] *Cf. K.A.C. v. Benson*, 527 N.W.2d 553, 558 (Minn. 1995)("cases permitting recovery for negligent infliction of emotional distress are characterized by a reasonable anxiety arising in the plaintiff, with attendant physical manifestation, from being in a situation where it was abundantly clear that plaintiff was in grave personal peril").

Moreover, Shank's negligence claim is much broader than a negligent infliction claim, and that broader claim is viable in these circumstances. *See University of St. Thomas*, 2019 WL 802740, at *5 (holding university owed student duty of due care even though student had not alleged any physical harm). Courts and the *Restatement* provide there is liability for emotional harm in cases like this, where the conduct "occurs in the course of specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious emotional harm." 2 *Restatement*

---

[137] C.App. 72(Shank192-93); S.App.245(3/6/15 incident report that Shank kept running into Student One); S.App.370(3/10/15 Wagner letter notifying Student One he violated no contact order).
[138] Sokolow Decl. Ex. 1 at 42-43(describing Shank's physical harm); S.App.468-71(detailing Shank's mental and physical harm); S.App.472-74(Shank's harm includes ██████████████████████████████████████).

*(Third) Torts* §47(b)(2012).  Indeed, institutional betrayal like Carleton's commonly causes much more significant damage to a student than the conduct of the assailant. Freyd Decl. Ex. 1 at 4; Jennifer Freyd & Pamela Birrell, *Blind to Betrayal* 38-39 (2013)(institutional betrayal exacerbates sexual assault and "is particularly toxic").

Shank's harm caused by Carleton's direct negligence was also foreseeable.  A jury could reasonably conclude it was foreseeable that Shank would be harmed by, for example, Carleton's failure to:  (1) move either Student One or Student Two from the same dormitory; (2) remove the Student One Posters; (3) offer Shank various academic and housing accommodations; and (4) follow up when Shank was ███████.

The fact that those and other actions or omissions by Carleton were required or precluded by Carleton's own policies and/or relevant law, further demonstrates the foreseeability of Shank's harm.  *Furek v. Univ. of Del.*, 594 A.2d 506, 520 (Del. 1991)(reversing j.n.o.v. in favor of university because university "was knowledgeable of the dangers of hazing," had a "policy against hazing," a policy "of discipline for hazing infractions," and an "overall commitment to provide security on campus," thus university owed "an assumed duty" to student burned during hazing).

Based on the foregoing, the Court should deny summary judgment on Shank's negligence claim.

## IV.    THE COURT SHOULD DENY SUMMARY JUDGMENT ON SHANK'S IIED CLAIM.

Judge Schiltz allowed Shank's IIED claim to go forward to the extent it was based on the one-on-one meeting, *Shank*, 232 F. Supp. 3d at 1114, about which there are

material fact disputes. *Supra*. Carleton argues the claim fails because Shank "insisted on meeting alone with Student One," D.M.35, and "there is no evidence of any intent by Carleton to cause severe emotional distress or knowledge that it was highly probable." *Id.* 36.

Carlson admitted, however, that the mediated conversation was all her idea. C.App.154-55(Carlson 111-13). Shank was also coerced because Carlson and Thornton told her (incorrectly) the meeting was the only way she could find out the sanctions.[139]

Evidence also shows Carleton knew it was highly probable such a meeting would cause severe emotional distress for Shank. Carleton was aware Shank's mental health was "unstable" at the time. Just three weeks before the meeting with Student One, a CCF was submitted indicating Shank was ███████████████████████████ ███████████████████████████████████████ ███████████████████████████████ C.App.669(CCF).[140] Carleton also knew Shank was terrified of Student One and had aborted a prior meeting with him because she was "freaked out." C.App.663.

Carlson and Thornton nonetheless pushed the meeting, making a dangerous effort at restorative justice without the requisite qualifications.[141] C.App.162(Shank 143); S.App.570-71(Koss Dep. 96-97). Indeed, Dr. Freyd testified the meeting was

---

[139] C.App.73-76(Shank 197-200, 205-06).

[140] *See* C.App.784(Carlson email); C.App.160(Carlson133-34).

[141] Carlson testified mediated conversations were used at Carleton for things like roommate disputes. *Supra* n.97 & accompanying text. Such disputes are a far cry from a rape case. Carleton also violated crucial restorative justice principles. *Supra* n.111.

"disastrous" and she would have advised "don't put these two people alone in a room together."  S.App.14.03(115).

On those facts, there is a jury question whether Carleton knew the emotional distress was highly probable.

## V.  THE COURT SHOULD DENY SUMMARY JUDGMENT ON SHANK'S ADA CLAIM.

Carleton argues Shank's ADA claim fails because Carleton provided Shank with sufficient accommodations.  D.M.25-30.  Again, this is a jury question.  Among other things, Carleton refused to offer Shank housing alternatives as required by its policies, S.App.243-44(Shank Aff. ¶¶2-3); refused to remove from Shank's academic record the incomplete grade she received the first semester of her freshman year (after the first rape), C.App.37-39; 41-42(Shank 68-73; 81-85); refused to let Shank attend summer school after her sophomore year, C.App.70(Shank 184-85); refused to let Shank attend one more semester at Carleton to finish her degree in 2015, C.App.390-91(V. Shank 178-79); continually put the onus on her to work things out with her professors, C.App.47(107); C.App.814; C.App.824-53; and gave her unnecessarily harsh academic feedback to further damage her tenuous mental and emotional state.  C.App.37-39; 41-42; 70(Shank 68-73; 81-85; 184-85); C.App.720; C.App.725; C.App.766; C.App.799; *supra* n.38(citing cases).  The Court should therefore let a jury decide the alleged adequacy of Carleton's accommodations.

## VI.  THE COURT SHOULD DENY THE MOTION ON SHANK'S PUNITIVE DAMAGES CLAIMS.

The Title IX standard and the Minnesota punitive damages standard (deliberate

indifference vs. deliberate disregard) are substantial equivalents.  Shank's proof supports both and the Court should deny the motion for the reasons set forth in the Title IX deliberate indifference discussion.

In the alternative, the Court should defer ruling on punitive damages until the jury returns a verdict on the first phase of the trial.

## CONCLUSION

Based on the foregoing, Shank asks the Court to deny Carleton's motion for summary judgment.

Dated: March 8, 2019

**BERENS & MILLER, P.A.**

s/Barbara P. Berens
Barbara Podlucky Berens (#209778)
Erin K. F. Lisle (#238168)
Carrie L. Zochert (#291778)
80 South 8th Street
3720 IDS Center
Minneapolis, MN  55402
(612) 349-6171
bberens@berensmiller.com
elisle@berensmiller.com

*Attorneys for Plaintiff*