# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Elizabeth M. Shank, | File No. 16-cv-01154 (ECT/HB) |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| Carleton College, | |
| Defendant. | |

Barbara P. Berens, Erin K. F. Lisle, and Carrie L. Zochert, Berens & Miller, P.A., Minneapolis, MN, for Plaintiff Elizabeth M. Shank.

Sean R. Somermeyer and Jacqueline A. Mrachek, Faegre Baker Daniels LLP, Minneapolis, MN, for Defendant Carleton College.

Elizabeth Shank is a graduate of Carleton College. Shank claims to have been raped twice by co-students while attending Carleton, once during her first year and again during her second year. This case is not about whether Carleton is liable for the rapes; it is about Carleton's response to the rapes. Shank alleges that Carleton's response was deliberately indifferent and deprived her of access to educational benefits or opportunities provided by the college. Shank asserts federal claims under Title IX and the Americans with Disabilities Act, and she asserts claims under Minnesota law for negligence, intentional infliction of emotional distress, and punitive damages. Carleton has filed a summary-judgment motion. Because Shank has not identified evidence that would permit a reasonable juror to find in her favor on essential elements with respect to each of her claims, Carleton's summary-judgment motion will be granted.

On the night of Saturday, September 10, 2011, during the first days of her first year as a student at Carleton College, Shank was raped in her dormitory by "Student One," another student who lived on her floor; Shank and Student One were intoxicated after attending an on-campus party.[2] C. 31–33; S. 342–43.[3] What began as consensual kissing became a sexual assault and rape. C. 33; S. 343. A day or two after, Student One sent Shank a private message on Facebook saying he "didn't seek consent from [Shank] and [he was] sorry about that, really sorry." C. 315, 621.

The following Monday, Shank sought assistance from Carleton's Student Health and Counseling Center ("SHAC"). C. 33–34, 581. Shank requested a "token" or "travel

---

[1]    In describing the relevant facts and resolving this motion under Federal Rule of Civil Procedure 56, all of Shank's evidence is believed, and all justifiable inferences are drawn in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Also—though Shank did not seek leave to proceed with this case anonymously—to the extent practicable, the relevant facts will be described to protect her privacy, the privacy interests of non-parties, and information in sealed submissions.

[2]    This opinion follows the Parties' convention of referring to the accused rapists as "Student One" and "Student Two." *See* C. 1. This is appropriate. Neither is a party to this case nor was the subject of discovery. Neither was criminally charged or convicted. As will be explained, only Student One was found formally to have violated Carleton's sexual-misconduct policy. That finding was made on a preponderance-of-the-evidence standard by Carleton's "Community Board on Sexual Misconduct," the body charged with adjudicating complaints of student-to-student sexual misconduct.

[3]    The record in this case exceeds 2,000 pages. Citations to documents from Carleton's appendix will appear in this Opinion and Order with the prefix "C.," and citations to documents from Shank's appendix will appear with the prefix "S." The page numbers for each citation refer to the pagination created specifically for each party's appendix (Carleton's denoted by "A," and Shank's by "Shank App."). Citations are not to the pagination assigned by ECF or the Bates-stamped page numbers assigned by the Parties during discovery.

voucher" for free transportation to Northfield Hospital so that she might get a "rape kit" and undergo a sexual assault forensic exam. C. 34. A receptionist told Shank that the SHAC does not "give out the tokens for services that Student Health and Counseling can provide." *Id.* However, Shank did not receive any forensic testing at the SHAC. C. 39–40. Shank did not go to Northfield Hospital to obtain forensic testing because she "was scared . . . didn't know where it was," and "thought if [she] went to the health center on campus they would help [her] get there." C. 35.

The next day (Tuesday), Shank went to see a counselor on campus. C. 35–36. Shank told the counselor, Drew Weis, that she "didn't want to file a complaint at that point." C. 36. Weis "explained that [she] didn't have to go to police" and could report the assault to Carleton. C. 36. Shank understood that Weis was "a confidential resource at Carleton," meaning he was obligated to maintain confidentiality regarding what Shank told him during their visit. C. 37. Shank also understood that Weis was required to report the assault for "statistical purposes," but that Shank's name would not be attached to it. *Id.*; C. 614.

Around early October 2011, a Carleton student submitted a Community Concern Form[4] to the Dean of Students Office about an unnamed first-year student who "had cuts

---

[4]     As one Carleton witness testified, "Community Concern Forms are a means of bringing information to the college for a variety of kinds of information. So we don't consider [them] part of our sexual misconduct process, per se. They are a way of contacting the college, usually the dean of students office, about an issue that someone might need to talk about or have support about." C. 225. "[A]ny student on campus . . . or any faculty or staff member" may submit a Community Concern Form. C. 254. These forms help Carleton "gather information about any type of concern," C. 254–55, and help Carleton track statistics pertaining to sexual-assault issues, C. 230.

and marks on their wrist that looked like they may have been self-inflicted."  S. 1; *see* C. 105.  Joe Baggot, then Associate Dean of Students and First-Year Class Dean, C. 98, S. 236, followed up with the student who submitted the Community Concern Form and asked if the student might be available to discuss the information reported in the form. C. 105–06; S. 2.  On October 14, that student emailed Baggot to "let [him] know that the name of the student . . . is Liz Shank."  S. 2.  In his deposition, Baggot testified that he did not follow up with Shank at that time because "the nature of the concern, a student who is cutting, did not rise to a level for [him] to call the student over to have a meeting about it." C. 106.  Baggot explained that during the course of his career, "this type of activity has changed from definitely a concern about a suicide attempt to an understanding, from health care professionals, that cutting, in and of itself, is not a suicide attempt and may be a coping mechanism for stress, anxiety, depression – all kinds of things."  C. 104–05.

Later in October 2011, Baggot learned that Shank was having difficulty in a math class.  *See* S. 234.  Responding to a request from the Dean of Students Office seeking "progress reports about students who are having significant difficulty in your classes," S. 235 (emphasis omitted), Shank's math professor reported on October 23 that she had received a "[b]ad F on [an] exam."  S. 234–35.  The professor wrote:

> Class attendance fairly regular.  Apparently she had a difficult time earlier in the term for reasons unrelated to the class, and fell behind.  (She also stopped handing in homework at that point, for several weeks.)  We had a conversation about what she would have to do to succeed and whether she had enough energy and motivation to catch up; she was going to consider it.  The other day her adviser contacted me and asked whether from my perspective it was OK for her to drop the class, so

> apparently that's what she is now planning (even though I
> haven't yet "officially" heard it from Liz herself).

S. 235. The next day, an administrative assistant emailed Shank on Baggot's behalf, writing: "Joe Baggot, your class dean, would like to meet with you to discuss your progress and identify resources which may help you successfully pass the class. Please call me . . . so we can find a time soon." S. 237. The record does not indicate that Shank followed up or met with Baggot in response to this message. *See* C. 107–108.

Shank was hospitalized from February 12 to 15, 2012, after making suicidal statements while under the influence of alcohol and marijuana. S. 4–8. The record contains no specific description of the circumstances in which Shank made these statements. However, a "discharge summary" medical record documents several statements Shank made to a treating physician while hospitalized regarding the incident and surrounding circumstances. S. 6–8. Though she initially denied "to EMS" providers that she had made suicidal statements, Shank eventually admitted making those statements. S. 6. Shank "denie[d] having anhedonia or crying spells and denie[d] having suicidal ideations, and she [said] that it only happened occasionally, like a couple of days ago." *Id.* Shank told her doctor that she had been experiencing panic attacks about once every two weeks "since November 2011." *Id.* Shank also reported to her doctor "that she was raped while intoxicated with alcohol in September 2011, by another student at the college and the student is living in the same dorm in the same floor and he is also on the track and field team, and he has posters of him all over the school." S. 8. Shank also admitted attempting

suicide "while intoxicated with alcohol in September 2011, by cutting," though the treating doctor noted "apparently this was a very superficial cut." *Id.*

On the same day Shank was first hospitalized (February 12), a student submitted a Community Concern Form to the Dean of Students Office relaying an anonymous report that Shank "had a history of self harm and was involved in a sexual situation Fall term with another student where there was sexual intercourse and no consent was given." C. 615. During her hospitalization, Shank's parents traveled to Minnesota, *see* C. 111, 652, and Baggot met with them in person on February 14, *see* C. 110, 115, 616. During that meeting, Baggot learned from Shank's parents that she "had been sexually assaulted and/or raped during fall term 2011." C. 616. Baggot described what Shank's parents told him during their meeting in a Community Concern Form:

> The parents said that they did not know the name of the young man that assaulted Liz. But, their daughter had told them that he lived on her floor and that he was on a team. The parents were very clear with me that their daughter understood how to file a complaint with the College if she wanted to do so and that their daughter certainly did NOT want to do so. A decision they respected. The parents stated that the reason they were telling me is that they wanted me to be prepared to support their daughter who would be returning to campus soon (from hospitalization).

*Id.* Baggot met with Shank the next day (on February 15), and documented in that same Community Concern Form that she had "confirmed all of the above." *Id.* He also documented that Shank was "pleased" to learn that Carleton was not investigating the rape. *Id.* Baggot's Community Concern Form was shared with Associate Dean of Students Julie Thornton and Carleton's Title IX Coordinator, Joanne Mullen. *Id.* After receiving the

form, Mullen wrote to Thornton: "Hi Julie, I understand Liz's reluctance to NOT take action, but we also have an obligation to make sure that our other students are safe. Let's talk about [how] we wish to proceed on this one." *Id.*

Shank continued to meet regularly with Baggot after she returned to campus and during the 2012 winter term. C. 44, 48. As part of their "working relationship," Baggot "agreed not to discuss the traumatic event of last fall" with Shank. C. 659. If Shank wanted to discuss the incident with Baggot, she "would let him know." C. 59. Shank also attended group-therapy sessions at the SHAC and met weekly with a private therapist in Northfield. C. 51; Lisle Supp. Decl. Ex. 61 [ECF No. 308]; *see also* C. 111, 647 (email from Baggot documenting his "expectation that [Shank] engage [in] appropriate health care for at least the remainder of the academic year").

In early April 2012, Shank asked about changing dorm rooms. *See* C. 50–51. Baggot facilitated Shank's request, instructing her how to request and obtain a room change and briefing the responsible Carleton staff so that Shank "[would] not be asked questions about why [she] want[ed] to move." C. 50, 595. Shank then moved from her room in Goodhue Hall to a single room in Myers Hall. C. 28, 50; S. 243–44. After the move, Shank emailed Baggot thanking him for his help and explaining:

> This move has literally been amazing for me. It's like I'm in an entirely different point in my life already and it feels incredible. I'm using the time I've gained from taking two classes [as part of a reduced schedule] to focus on truly getting better for the long term . . . I don't think I would have been able to do so well if I were still in my old dorm, so this was crucial. Thanks again.

C. 597.

On April 19, 2012, a Community Concern Form was filed with the Dean of Students Office identifying Student One by name as the perpetrator of a sexual assault, and Carleton was able to connect this report to Shank's September 8, 2011 rape. C. 617. The form was filed by a member of a student group called Campus Advocates Against Sexual Harassment, of "CAASHA," but Shank participated in the drafting and submission of the form. *Id.*; C. 58. The form described that "[a]n incident of sexual assault occurred between [Student One] and a female member of the same grade level. There was alcohol involved with both parties." C. 617. Though the form did not mention Shank, the date of the assault, or where the assault occurred, Associate Dean Thornton nonetheless was able to deduce that Shank was the victim of the assault described in the form. *Id.* In an email forwarding the Community Concern Form, Thornton added that Student One "is a first-year student, living in Goodhue, and a member of the track team," facts she knew already about Shank's rapist. *Id.*[5] Mullen replied to Thornton's message, writing "Ok . . . it's making sense," suggesting that she also identified Shank as the victim of the sexual assault described in the form. *Id.* Cathy Carlson, the Dean of Students for juniors and seniors, C. 135, followed up with the student (CAASHA member) who submitted the form, S. 254. Carlson then emailed Thornton, Baggot, and Weis to summarize what she had learned from that student and to "delegate the next steps based on the knowledge I have gleaned from this case."

---

[5] The precise source of Thornton's knowledge of these facts is unclear, but neither Party suggests it matters. Except for the fact that Student One "is a first-year student," these facts are described in the discharge summary medical record, S. 6–8, and Shank testified in her deposition that she had signed a "release of information" to Baggot, C. 44. Also, Baggot reported that Shank's parents had told him that "the young man that assaulted Liz . . . lived on her floor and . . . was on a team." C. 616.

S. 254. Carlson wrote that the "reason this is coming forward . . . is because Liz is concerned that [Student One] may be an RA [or resident assistant] next year." *Id.*; *see* C. 58, 661. Carlson explained her understanding that "[a]t this point in time Liz does not want to go through the formal process, but she does want someone [sic] she is uncomfortable with the potential of him being in a leadership position." S. 254. Carlson also recounted explaining to the reporting student "that the college must respond when we have this much information regarding an alleged sexual misconduct case." *Id.* Carlson then asked Thornton to contact Student One and Baggott to contact Shank. *Id.* Shank was not told at that time of the possibility that Carleton might proceed with a complaint against Student One even if she decided not to. S. 255–56.

One week later, on May 1, 2012, Amy Sillanpa, Carleton's Associate Director of Residential Life and Title IX Deputy, met with Shank to discuss whether she wanted to "go forward with a complaint." S. 256, 330. After the meeting, Sillanpa described being distressed (Sillanpa wrote that she was "freakin' out") because Student One had been hired to work as an RA during the next academic year. S. 255. Sillanpa reported that Shank was "still thinking about what she wants to do for sure," but that she wanted a Sexual Misconduct Support Advisor assigned to assist her with writing a statement. *Id.* That same day, Carlson agreed to serve as Shank's Sexual Misconduct Support Advisor. S. 255; C. 59, 137. Shank and Carlson met in person "from time to time" during May 2012 and exchanged numerous emails. C. 143; *see* C. 62. In a May 11 email to Sillanpa, Carlson reported that she and Mullen had met together with Shank. S. 325. Carlson wrote that Shank was "still in limbo about what she is planning to do," but that "she definitely needs

some space to make her decision." *Id.* Shank testified that she felt "the pressure [was] on for [her] to file a complaint after [the meeting with Carlson and Mullen]." C. 62 ("Q: Did [Mullen] say that [you really need to file a complaint] or is that how you felt? A: Felt. That's how I understood it."). Shank also testified that she recalled Mullen "saying we need to protect other women." C. 63.

As of May 16, Shank remained uncertain about whether she would file a complaint or a statement. *Id.* That day, Shank emailed Carlson explaining that the statement was proving difficult to write and asking: "Do I definitely need to do this? I mean, do I still have any choice to back out, or is it too late for that since the college is involved?" C. 677. Carlson responded: "If you cannot write a statement, do not write a statement. Whatever you indicate you would like to do is absolutely fine." C. 676. Carlson also explained to Shank that, regardless of whether she submitted a statement, Carleton was likely to move forward based on the Community Concern Forms and other information that had been submitted regarding the incident. *Id.* On May 18, Shank submitted a two-page statement describing her recollection of the rape. C. 618–20. At the time, Shank described how "writing this all out has definitely been beneficial for my healing process, though, so I am grateful for that." C. 679. Though Carlson told Shank that if she "wish[ed] to articulate in writing what [she] believe[d would] be an appropriate sanction, [she] should do so," C. 66, and though Shank understood that she had that opportunity, she did not provide a recommended sanction. C. 66–67 ("[W]hat I wanted was for him to get expelled, but I didn't want him to think that I was the reason he got expelled. . . . I didn't want to have a target on my back."); *see also* C. 143 (testimony from Carlson that Shank "never expressed

to me that she wanted to have him suspended or expelled during this [May 2012] timeframe").

Mullen and Thornton determined that a complaint would "go forward" with Carleton as the complaining party, a procedure not contemplated explicitly by its sexual-misconduct policy at that time. C. 307–08; *see* C. 557–70 (contemplating that the victim is the complainant). In reaching the decision to proceed in this way, Mullen consulted with counsel. C. 307–08. Mullen was to "put together an investigative report, and present that report" at a hearing before the Community Board of Sexual Misconduct ("the Board"). C. 295–96; *see* C. 299 (describing the investigation process of gathering documentation, interviewing witnesses, and preparing a memo), C. 610–22 (Mullen's report of the sexual-misconduct investigation). The report Mullen prepared concluded that "since [Student One] remembered so little of the evening . . . Shank's retelling" of the events in question was "generally accepted" and that "there appears to be no dispute that at some point Shank did not give consent." C. 612.

Before the hearing, Carlson submitted additional information on Shank's behalf to the Board. C. 689. That information included a statement entitled "Sexual Misconduct Finding/Sanctions" that read:

> Liz trusts that the SMRB will consider all aspects of the case and make a determination about the finding and sanction which are consistent with other Sexual Misconduct cases. Liz encourages the SMRB to consider whether or not [Student One] is an appropriate choice as an RA position. Regardless of the finding Liz Shank would like to have closure regarding this incident. This could be in the form of a mediated conversation between Student One and Liz concerning the nature of future interactions at Carleton.

*Id.* The idea of a "mediated conversation" originated with Carlson. C. 153–55 ("Q: And was this, the idea of the mediated conversation, something Liz told you or that you just said, 'Here's an option if she's going to have closure'? A: Here's an option for closure."). Carlson forwarded a copy of what she submitted to the Board to Shank on May 29. C. 688.

The hearing on Carleton's complaint against Student One occurred on May 30, 2012. C. 575; *see* C. 624–27. The Board found, by a preponderance of the evidence, that Student One violated Carleton's sexual-misconduct policy and sanctioned him. C. 575–76. Student One's sanctions included requirements that he: (1) remain on disciplinary probation until June 15, 2013, meaning he "must remain in good standing with the College academically and socially" or he would risk "severe and immediate consequences, which the [B]oard recommend[ed] to be suspension"; (2) abide by a no-contact order and agreement; (3) "[i]f Shank is still interested in a mediated conversation," then the Board "support[ed] this conversation" taking place; (4) resign his RA position, "[a]ttend regular and ongoing counseling," including at least two sessions during the summer months, to address "the variables surrounding this case; sex and healthy relationships, consent, alcohol use and abuse, and personal responsibility," submit a "thoughtful" letter "requesting to return to Carleton that demonstrates an understanding of [his] past actions and their affects"; and (5) continue with counseling through the SHAC or a local provider upon his return to campus in fall of 2012. *Id.* Student One also was required to sign a release of information authorizing counselors to share records with the Dean of Students "during the summer and fall term." C. 576. That Student One's sanctions did not include either

expulsion or suspension was unusual. S. 350–52 (discussing Carleton report on sexual-misconduct incidents and that Student One's sanctions arguably were inconsistent with two other cases where students violated the sexual-assault policy and were suspended for one year); C. 152 (Carlson testifying that "[b]ased on what [she] had learned, [she] thought he should have been suspended"); C. 288 (Carleton official testifying that she was not aware of other cases where a student was found in violation of the sexual-misconduct policy but was not suspended or expelled). Shank was permitted to know the details of Student One's no-contact order, and she was informed of the possibility of a mediated conversation, because these aspects of Student One's sanctions pertained to her. *See* C. 704 ("[T]here were eight individual sanctions/requirements listed in [Student One's] determination letter. The two that are related to you are listed below, others are private and need to remain that way to protect his private student record."); S. 441. Neither Student One nor Carleton appealed the sanctions. *See* S. 350. After learning that Student One had not been expelled or suspended, Shank asked if she could appeal the Board's decision. C. 69. Carlson told Shank that she could not appeal because she was not the complainant. *Id.*

Shank and Student One returned to Carleton in the late summer of 2012 to begin their second years, and on October 15, 2012, Shank and Student One met in person. C. 76. Shank received conflicting advice about whether this meeting was wise. Shank's therapist "wasn't thrilled with the idea," and her mother "also didn't think it was a good idea" and tried to talk her out of it. C. 75; *see* C. 383–84 (Shank's mother's testimony that she thought the meeting "was a bad idea"). In preparation for the meeting, Shank prepared

"guidelines" for the conversation. *See* S. 444–45; C. 710–11. Carlson reviewed and commented on the guidelines Shank prepared. S. 444. "There were plans" for Carleton officials to meet before with Student One, but "he could not meet," and no meeting between Carleton officials and Student One occurred before his in-person meeting with Shank. C. 163. Shank and Student One met in Thornton's office, which was adjacent to Carlson's office. C. 76. Shank told Carlson that she refused to meet with Student One if anybody else was present, and no Carleton official attended the meeting. *Id.* Shank was told she could "knock on the wall or bump the wall" to Carlson's office if she felt a need for assistance, and Carlson would "come right over." C. 164. Immediately after the meeting, Shank and Student One jointly requested that the no-contact order imposed as a sanction on Student One be lifted, and Carleton complied the next day. C. 716; S. 449. In her deposition, Carlson testified that, with hindsight, she found it strange that a person who had been raped would want to meet with her rapist, but that "[a]t the time," she did not have a feeling that this was a bad idea because Shank "was very confused as to what exactly happened" and she didn't know if Shank "would have called it a rape at that time." C. 154. Carlson testified that she "felt like [Shank] seemed like she was in a good place to be able to . . . make that determination to have that conversation." C. 162. Shank testified that she "trusted the wrong people, like Cathy [Carlson] and Julie [Thornton]" in deciding to go forward with the meeting. C. 75–76.

On Saturday, April 6, 2013, Shank was raped by "Student Two," a senior who lived in the same dormitory as Shank. C. 77. Shank went to Student Two's dormitory room to admonish him for his predatory behavior toward other women. C. 79, 745–47. Shank was

intoxicated. C. 746. Student Two also had been drinking but was "[n]ot too drunk." *Id.* The two talked for a time, and as Shank described it: "The entire night I was trying to make it clear to him that this wasn't okay. And now, after I thought I got through to him so he wouldn't mess with other girls' bodies and minds, he was doing the same exact thing to me." *Id.* Shank suspected that Student Two had drugged her because, as she explained it in her deposition, things were spinning and she "went from being furious to, like, euphoric." C. 79.

Shank met with Carlson the following Monday. *Id.* She testified that she went into this meeting "want[ing] to file a formal complaint" but that Carlson "talked [her] out of it" and convinced her to file a Community Concern Form instead. C. 77. In her deposition, Shank recounted what she recalled Carlson saying:

> And, so, it was—this was a really rough time. I don't—I just remember her saying, like, you have to focus on school. Like, you're going to be suspended. Like, you can't file a complaint right now. And, like, you know, he's going to be, like, off campus in two months anyway. Like, maybe you should consider, like, taking a medical leave since you're, like, behind in your classes and, like, all this stuff.

C. 79. (Carlson says she told Shank that "if she doesn't want to go forward, if she doesn't want to do anything with this, she does not have to; that she should continue to focus on her overall health and well-being so she can graduate. . . . But I was not telling her she should not go through the complaint process. I want that clear." C. 168.) Shank emailed Carlson on April 11, writing: "I don't think I can handle having my name attached to anything involving [Student Two] right now," and "[t]his seems like a really complex situation, and I think the best thing right now might be to distance ourselves from him . . .

I'm just really worried about school right now and I don't think letting this distract me any more than it already has would be good for anyone." C. 720. In reply to Shank's April 11 email, Carlson wrote: "No need to apologize. You are right, you need to focus on your homework and your personal health!" *Id.* On Thursday, April 18, Shank emailed Carlson again, writing that, after a scheduled meeting "on Friday," she would "not involve [her]self with any kind of [Student Two] drama." C. 725.

On April 24, 2013, Shank and three other female Carleton students jointly reported Student Two's behavior—including the April 6 rape and his "behavior towards women [generally], especially in situations where alcohol is involved—in a Community Concern Form. C. 744–47; S. 450–57. In the form, Shank described the incident and the facts leading to it in detail. *Id.* She also wrote: "I have no intention of filing anything with the Sexual Misconduct Board, since my emotional baggage makes it very hard for me to see what happened with [Student Two] in an objective way." C. 745; S. 452.

In response, Baggot met with Student Two on April 25—the day after the Community Concern Form had been submitted—and spoke with him about the behavior alleged in the form. C. 126–27, 671. Baggot expressed concern with Student Two's "use of alcohol and other drugs" described in the form. C. 671. He also issued a directive to Student Two that he not to have any contact with the four women who submitted the form "from this day forward." *Id.* As Baggot explained:

> This means that you are not to contact them in person, through telephone or electronic means, and/or having other people contact them on your behalf. The students have agreed not to initiate any communication with you as well. Please know that

> any violation of this directive could result in disciplinary action
> against you up to and including suspension from the College.

*Id.* No complaint or other sanctions were pursued against Student Two.

The complaint and factual record are for the most part silent about what occurred during Shank's junior year (fall 2013 through spring 2014). In January 2015, during Shank's senior year, Shank and Student One enrolled in the same course. C. 749. Shank reported to Carleton on January 14, 2015, that this was "causing [her] a lot of distress and impacting [her] ability to be a student at Carleton," and she requested that the original no-contact order be reinstated. *Id.*; *see* S. 245 (noting that "when [Student One] appeared in [Shank's] class . . . the memories of the sexual assault were triggered"). Carleton complied the very next day, reinstating the no-contact order on January 15. C. 751, 753; *see* C. 523, S. 370. As a result, Student One unenrolled from the course and was restricted from several other specific locations on campus. C. 751, 753.

In February 2015, Shank pursued accommodations from Carleton relating to her diagnosis of post-traumatic stress disorder ("PTSD"). *See* C. 755–58; S. 468–71. She obtained a "Verification of Disability" from Krista Larson, MSW, LICSW. S. 472–74; C. 526–28. Larson's report outlined Shank's symptoms, medications, and treatment history. *See id.* On the final page, Larson "[r]ecommended academic accommodations." S. 474; C. 528. The same day Shank submitted this narrative report, she met with Andy Christensen, Carleton's Coordinator of Disability Services. *See* C. 763–64. He responded with a thorough, two-page, single-spaced email addressing Shank's requested accommodations. *Id.* He granted her requests for a notetaker and alternative testing space;

he denied her request to access courses via video recording, but instead offered to relocate all her classrooms to "spaces on campus that minimize the adverse effect of [her] disability, allowing [her] to attend class physically." *Id.* Shank accepted that accommodation. C. 763. Christensen did not grant or deny Shank's request for additional time for assignments, alternative assignments, verbal versus written testing, or reduced attendance requirements; he indicated these requests were better addressed "instance by instance rather than a blanket decision," but that he was "willing to do this work" of "negotiating with professors." C. 764.

At the end of February 2015, Student One violated the reinstated no-contact order by attending a computer-science gala that Shank also attended. C. 90. Student One admitted knowing Shank was a computer-science major but asserted that he attended the event to support his roommates and that running into her was "unintentional." S. 370. This prompted meetings between Shank and Carleton officials, C. 90, in which Carleton learned for the first time in early March 2015 that the Student One rape was "more violent than [Shank] had reported," C. 805; S. 245. Carlson's testimony summarizes the impact this report had: "[I]t changed it from a he-said/she-said first-time encounter with sex and alcohol to a violent, almost premeditated rape, and that's very different." C. 171. Carlson brought this new information to Thornton, but she didn't recall any other follow-up with Thornton or discussion of a "retri[al]" for Student One. *Id.* Shank communicated that she wanted Student One to be expelled or suspended. *See* C. 147. Within two weeks, on March 10, 2015, Carleton modified the no-contact order so that Student One was prohibited from being on campus during the remainder of his senior year and was required to finish his

degree off-campus; Student One was allowed to return to campus only for the graduation ceremony.  S. 370; C. 772, 777 (emails between Wagner and Shank's parents discussing possible accommodations at graduation to ensure "there will be no inadvertent contact"), 875.  Shank graduated in 2015, but she did not attend the graduation ceremony.  C. 91–92.

## II

Shank commenced this lawsuit against Carleton in May 2016.  Compl. [ECF No. 1]; Am. Compl. [ECF No. 6] (amended pursuant to Fed. R. Civ. P. 15(a)(1)(A)).  She brought numerous federal and state claims, but not all survived a motion to dismiss brought by Carleton under Federal Rule of Civil Procedure 12(b)(6).  *See Shank v. Carleton Coll.*, 232 F. Supp. 3d 1100, 1117 (D. Minn. 2017) (Schiltz, J.).  Shank's Title IX claim was dismissed "to the extent that it allege[d] that, by condoning underage and excessive drinking, [Carleton] was deliberately indifferent to an increased risk of sexual assault."  *Id.* at 1108–10, 1117.  Shank's Title IX claim was not dismissed insofar as it alleged "that Carleton's response to the rapes was inadequate and that, as a result of Carleton's various failures, [Shank] was 'excluded from participation in, . . . denied the benefits of, [and] subjected to discrimination under [Carleton's] education program' on the basis of sex."  *Id.* at 1109–10 (second, third, and fourth alterations in original).  Shank's claims under the Americans with Disabilities Act (ADA) and the Rehabilitation Act survived Carleton's motion to dismiss, though the allegations supporting these claims were characterized as "slender" and "(barely) sufficient."  *Id.* at 1110.  Shank's negligence claims were allowed to proceed, though the Court cautioned that these claims faced hurdles:

> The Court also notes that, even if Shank can establish that Carleton owed her a duty to *prevent* the rapes, Shank most likely cannot maintain a negligence claim on the basis of Carleton's *response* to the rapes. Carleton's allegedly negligent response to the rapes caused Shank to suffer emotional injuries, but it did not inflict or risk inflicting any physical injuries. The tort of negligent infliction of emotional distress is, however, strictly limited to situations in which the defendant placed the plaintiff in grave physical danger for a specifically defined period of time. *Wall v. Fairview Hosp. & Healthcare Servs.*, 584 N.W.2d 395, 408 (Minn. 1998).

*Id.* at 1111–12. Shank's claim of negligence *per se* based on Carleton's alleged violation of the City of Northfield's Social Host Ordinance was dismissed because Shank alleged no "plausible causal connection between an ordinance violation . . . and the rape by Student Two." *Id.* at 1112–13. Shank's claim of intentional infliction of emotion distress was dismissed except insofar as Shank alleged "that Carleton coerced her into a one-on-one meeting with her assailant, knowing that such a meeting was likely to cause her severe emotional distress." *Id.* at 1113–14. Shank's claim under Minnesota's social-host liability statute, Minn. Stat. § 340A.90, was dismissed because the Court determined "that § 340A.90 imposes liability only on natural persons age 21 or older." *Id.* at 1114–15. Finally, Shank's breach-of-contract claim premised on promises in Carleton's Student Handbook was dismissed because the "promises on which Shank relies—such as promises to be 'supportive' and 'fair'—are broadly worded generalities that are not capable of objective application . . . [and] too general to be enforceable." *Id.* at 1116–17. Shank later was given leave to amend her complaint to add a claim for punitive damages. *See Shank v. Carleton Coll.*, No. 16-cv-1154 (ECT/HB), 2018 WL 4961472 (D. Minn. Oct. 15, 2018),

*aff'd*, 329 F.R.D. 610 (D. Minn. Jan. 7, 2019); *see also* Second Am. Compl. [ECF No. 227]. Carleton now seeks summary judgment on all of Shank's claims. ECF No. 237.

III

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.

A

1

Title IX prohibits sex discrimination by recipients of federal education funding. It provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). "In *Cannon v. University of Chicago*, the Supreme Court held that Title IX provides an implied private right of action for an individual claiming injury due to an educational institution's unlawful sex discrimination and that the claimant may sue the institution and obtain relief." *Cobb v. U.S. Dep't of Educ. Office for Civil Rights*, 487 F. Supp. 2d 1049, 1053 (D. Minn. 2007) (citing *Cannon*, 441 U.S. 677, 717 (1979)).

In *Davis ex rel. Lashonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999), the Supreme Court clarified that funding recipients "may be liable in damages" only for their "own misconduct," and reaffirmed that liability arises only when the school "itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent" to acts of discrimination of which it had actual knowledge. *Id.* at 640–42 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). A Title IX plaintiff must show that a defendant school was "(1) deliberately indifferent (2) to known acts of discrimination (3) which occur[ed] under its control." *Maher v. Iowa State Univ.*, 915 F.3d 1210, 1213 (8th Cir. 2019) (alteration in original) (quoting *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017)). The bar for deliberate indifference is high. "A school is deliberately indifferent when its 'response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Maher*, 915 F.3d at 1213 (quoting *Davis*, 526 U.S. at 648). "Deliberate indifference is a stringent standard of fault that cannot be predicated upon mere negligence." *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019) (quoting *Doe v. Flaherty*, 623 F.3d 577, 584 (8th Cir. 2010)). A federal court "should refrain from second-guessing the disciplinary decisions made by school administrators." *Dardanelle Sch. Dist.*, 928 F.3d at 725 (quoting *Davis*, 526 U.S. at 648). The deliberate-indifference standard is intended to provide school administrators with "the flexibility they require" to exercise disciplinary authority. *Davis*, 526 U.S. at 648. Once deliberate indifference is shown, a Title IX plaintiff must also establish that alleged harassment "is so severe, pervasive, and objectively offensive that it can be said to deprive the [plaintiff] of access to the educational opportunities or benefits provided by the school."

*Id.* at 650. "In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649.

2

Shank alleges that Carleton's response to the two rapes was deliberately indifferent, and she identifies many acts by Carleton that she alleges demonstrate deliberate indifference. In her second amended complaint, Shank identifies sixteen such acts and says they are "without limitation" to others she might also allege. Second Am. Compl. ¶ 220(a)–(p). She identifies many of these same acts and more throughout her brief in opposition to Carleton's summary-judgment motion. *See* Mem. in Opp'n [ECF No. 274]. The volume of Shank's allegations makes it difficult to separate those that matter more to her claims from those that matter less, but it seems important to observe up front that some of Shank's allegations obviously do not show or contribute to show the presence of a genuine dispute as to any material fact regarding deliberate indifference. Other allegations seem more central to Shank's summary-judgment opposition. *Id.* at 32–34, ¶¶ 1–15. But none shows the presence of a genuine dispute as to any material fact regarding deliberate indifference.

a

Several of Shank's deliberate-indifference allegations are plainly insufficient to show deliberate indifference. Some allegations lack a meaningful connection to her Title IX claim. For example, citing a lawsuit filed against Carleton in 1991 and several Carleton student newspaper articles and editorials from various dates, Shank alleges that Carleton has a "long history of wrongdoing in responding to campus sexual assaults" and a "pattern

23

of arrogance, victim blaming, and deliberate indifference/disregard in the face of years of demands for change." *Id.* at 4–7. It is difficult to understand, and Shank does not explain, how the allegations made in a lawsuit filed some twenty-five years before this case began might establish deliberate indifference here. The same is true of the newspaper articles and editorials. Shank seems to cite these because their content is critical of Carleton's response to sexual violence generally, but she does not explain how that content establishes deliberate indifference in her case. Other allegations seem foreclosed by the order partially granting Carleton's motion to dismiss. Shank alleges, for example, that "Carleton's willful blindness and illegal condonation of underage drinking, despite the known risks of alcohol, created a culture of sexual assault." *Id.* at 7 (footnote omitted). But as explained earlier, Shank's Title IX claim was dismissed "to the extent that it allege[d] that, by condoning underage and excessive drinking, [Carleton] was deliberately indifferent to an increased risk of sexual assault." *Shank*, 232 F. Supp. 3d at 1117. Some of Shank's allegations lack citation to the record. Fed. R. Civ. P. 56(c)(1)(A). For example, Shank alleges that "further encounters between [her] and the two rapists occurred because [she] continued to live in the same building as both rapists." Mem. in Opp'n at 14 n.38 (citations omitted). As authority for this fact assertion, Shank cites, not to materials in the record, but to two judicial decisions issued in Title IX cases in the District of Connecticut. *Id.* (citing *Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 236 (D. Conn. 2009); *Kelly v. Yale Univ.*, No. 3:01-cv-1591, 2003 WL 1563424, at *4 (D. Conn. Mar. 26, 2003)). Some of Shank's allegations are too general to be probative of deliberate indifference. Asserting, for example, that Carleton "minimize[ed] . . . Shank's immediate emotional reaction" to the

first rape is, without more, not helpful.  Mem. in Opp'n at 32, ¶ 1.  Finally, Shank seems

not to pursue some allegations made in her complaint.  For example, she seems no longer

to rely on her allegation that Carleton's public response to this lawsuit shows deliberate

indifference.  Second Am. Compl. ¶ 220(p).

b

Shank contends that the "refusal to provide [her] with a token to a local hospital to

get a rape examination" and other actions of SHAC employees discouraged her "from

obtaining a rape exam."  Mem. in Opp'n at 32, ¶ 1.  This assertion might be understood

two ways in the context of her Title IX claim.  First, Shank might be saying that the SHAC

employees' actions were deliberately indifferent to her report of the first rape.  In *Gebser*,

the Supreme Court held that deliberate indifference must be exhibited by "an official of the

recipient entity with authority to take corrective action to end the discrimination."  524 U.S.

at 290.  It is true that no "bright-line rule" determines whether a person meets this test and

that it may require in some cases a close examination of many facts.  *Plamp v. Mitchell

Sch. Dist. No. 17-2*, 565 F.3d 450, 457 (8th Cir. 2009) (citation omitted); *see also Frederick

v. Simpson Coll.*, 149 F. Supp. 2d 826, 836 (S.D. Iowa 2001) (noting "'the bulk of

employees' are excluded from being such an appropriate person").  But here, the

undisputed facts show that the SHAC employees Shank identifies are effectively forbidden

(and thus do not have authority) to take corrective action: "Anyone in [SHAC] has legal

confidentiality . . . as a therapist or medical practitioner" and is "exempt from the required

reporting responsibility under Title IX."  C. 217, 499; *see also* C. 562.  If a SHAC employee

had reported the first rape, it would not have been "in any identifying manner."  C. 562.

Confidentiality aside, nothing in the record shows that SHAC workers by virtue of their positions might have possessed authority to take corrective action. Rather, they seem just like workers whose roles other courts have found legally insufficient to give them authority to take corrective action under Title IX. *See*, *e.g.*, *Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1292 (10th Cir. 2017) (campus-security officers); *Hill v. Cundiff*, 797 F.3d 948, 971 (11th Cir. 2015) (teacher aides); *Ramser v. Laielli*, 276 F. Supp. 3d 978, 993 (S.D. Cal. 2017) (peer advocates), *aff'd*, 2019 WL 2950095 (9th Cir. July 9, 2019); *Nelson v. Lancaster Indep. Sch. Dist. No. 356*, No. 00-cv-2079 (JRT/RLE), 2002 WL 246755, at *5 (D. Minn. 2002) (bus drivers). Second, Shank might be saying that Carleton—or, more precisely, a Carleton official with authority to take corrective action—was deliberately indifferent to harassment or other discrimination by SHAC employees. If Shank means to advance this contention, it is insufficient as a matter of law because no record evidence supports it. Understanding the facts in the light most favorable to Shank, the denial of the token and other actions by SHAC employees were for her a one-time event. Shank claims that the SHAC receptionist and nurse's refusals to provide her a token violated Carleton's Sexual Misconduct Policy. C. 39, 567. Thus, no evidence shows that SHAC employees acted pursuant to Carleton policy. Assuming the token's denial was included as part of the reports to Carleton officials of the first rape (a fact not clear from the record), there is no evidence showing either deliberate indifference to this report or any continuing problem.

c

Shank argues that defects in the process that resulted in Student One's discipline would permit a reasonable juror to conclude that Carleton was deliberately indifferent.

Mem. in Opp'n at 32–36. Shank identifies several flaws with this process. She objects to Carleton's initiation of it as the complaining party, her exclusion from the hearing before the Community Board on Sexual Misconduct, and to not being informed of all sanctions imposed by the Board. *Id.* at 32 & 33, ¶¶ 5, 8. She disputes the adequacy of the investigation undertaken as part of the process. *Id.* at 33, ¶ 6. She asserts that she was not given an adequate opportunity to weigh in regarding the appropriate sanction or sanctions to be imposed on Student One, and she says that she should have been allowed to appeal the sanctions that were imposed. *Id.* at 33, ¶ 9; *see id.* at 22.

No reasonable juror could conclude that the Student One disciplinary process exhibited deliberate indifference. Carleton's decision to initiate the process as the complaining party was a reasonable reaction to Shank's indecision and reluctance over filing a complaint. The record demonstrates that Carleton informed Shank repeatedly about her right to pursue a complaint and what that process would entail. For example, Shank and the counselor with whom she met soon after the first rape, Weis, discussed the possibility of filing a complaint with Carleton. C. 36. According to Shank, Baggot raised the possibility of her filing a formal complaint "whenever" they met. C. 59 ("[W]henever I would meet with him, he would ask me, like, if I wanted to report it and . . . file a complaint, like a formal complaint. And I said no."). And Shank reviewed a checklist regarding the complaint process with Carleton's Sexual Misconduct Complaint Process

Coordinator, Sillanpa. C. 61–62, 601–02.[6] Shank's reluctance to file a formal complaint is understandable, S. 169 (Community Board on Sexual Misconduct presentation noting that "not all students choose to pursue the complaint process" because "[i]t can be very trying emotionally, and isn't a good fit for everyone's healing process"); S. 298 (Carleton Sexual Misconduct Support & Response presentation indicating that "[t]here is no 'normal' response to trauma"), but her reluctance cannot be attributed to a lack of information from Carleton concerning the availability or nature of the process. Carleton's decision to proceed with the process as the complaining party reasonably balanced Shank's need for time and "some space" to decide whether to file a complaint, S. 325, with Carleton's need to address the situation given its knowledge of what happened, S. 254, its concerns about Student One serving as an RA, campus safety, and the soundness of addressing the incident before the end of the academic year. Thornton admitted that under these unique circumstances, the college was "making it up as [they] went along," C. 444, but the novelty of the process would not itself permit a reasonable juror to find deliberate indifference. Carleton's decision to proceed as the complaining party seems like a school exercising just the sort of "flexibility" the Supreme Court contemplated in *Davis*. 526 U.S. at 648.

Carleton did not exclude Shank from the process; the record establishes beyond dispute that she played a significant role and that she could have played a larger role but declined. Carleton encouraged Shank to submit a written statement, though she was not

---

[6] *See Roe v. St. Louis Univ.*, 746 F.3d 874, 883 (8th Cir. 2014) (holding that university was not deliberately indifferent because it had "explained the process for reporting," among other things).

interviewed and did not testify at the hearing, C. 610, 618–20, and it informed her of the status of at least parts of the process, *see* C. 66, 685–86. Shank was invited "to articulate in writing what [she] believe[d would] be an appropriate sanction," C. 66, but declined. The results of Mullen's investigation amplified Shank's role and cannot reasonably be characterized as deliberately indifferent. Mullen concluded that "since [Student One] remembered so little of the evening . . . Shank's retelling" of the events in question would be "generally accepted." C. 612. It was not deliberately indifferent for Carleton to conclude that, because Shank was not the complaining party, there were limits around the information it could provide to her and her rights to object or appeal. Shank alludes to this issue in a footnote in her brief. Mem. in Opp'n at 27 n.108. There, she cites a section of the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1092(f)(8)(B)(iv)(III)(aa), and an accompanying regulation, 34 C.F.R. § 668.46(k)(3)(iv) and (l), for the proposition that "[t]he law requires" a disclosure of sanctions to the victim and "provid[ing] such disclosures do **not** violate FERPA." It is not clear whether Shank's interpretation is correct. The statute she cites provides that "both the *accuser* and the accused shall be simultaneously informed, in writing, of . . . the outcome of any institutional disciplinary proceeding that arises from an allegation of . . . sexual assault." 20 U.S.C. § 1092(f)(8)(B)(iv)(III)(aa) (emphasis added). The regulation contemplates "simultaneous notification, in writing, to both the *accuser* and the accused, of . . . [t]he result of any institutional disciplinary proceeding that arises from an allegation of . . . sexual assault." 34 C.F.R. § 668.46(k)(2)(v) (emphasis added). Shank cites no authority establishing that a victim who files no formal complaint is an "accuser" under the statute. More to the point,

she cites no authority suggesting that Carleton's understanding of its obligations under the law shows deliberate indifference.

d

Shank asserts that her in-person meeting with Student One shows that Carleton was deliberately indifferent. Mem. in Opp'n at 33, ¶¶ 12–13. Shank says the idea for the meeting was Carleton's and that she was coerced into participating in the meeting. *Id.* at 24–26. She cites an April 4, 2011 letter authored by the Department of Education's Office for Civil Rights (OCR)—what has become known as the "Dear Colleague Letter"—in which OCR advised against mediation in cases involving sexual assault. *Id.* at 25. She also cites two of her experts who testified critically regarding the use of mediation, restorative justice, and in-person meetings between a rapist and victim to resolve sexual-assault complaints. *Id.* at 25 n.94–95.

No reasonable juror could conclude that Shank's in-person meeting with Student One shows deliberate indifference by Carleton. It is true that the idea for a mediated conversation originated with Carleton, specifically Carlson, C. 153–55, that Carleton included the possibility of the meeting as part of Student One's discipline, C. 575–76, and that Carleton facilitated the meeting. But that is as far as the record evidence goes to support Shank's argument. No evidence shows, and Shank does not seem to contend, that she was required to participate in the meeting. It was included as part of Student One's discipline on the condition that Shank be "interested" in a meeting. C. 575. The Community Board on Sexual Misconduct's sanctions letter made clear that no meeting would take place without Shank's agreement. It is not clear precisely what Shank means

when she argues that she was "coerced" into the meeting. Mem. in Opp'n at 26–27. She cites no evidence showing that Carleton exercised compulsion or duress. To the contrary, the record establishes beyond any genuine fact dispute that Shank did not face coercive pressure to meet with Student One. For example, as noted earlier, Shank's therapist and mother advised against the meeting. C. 75; *see* C. 383–84. Shank says she trusted the advice of Carlson and Thornton. C. 75. That she acted in the face of conflicting advice seems incompatible with the idea that Shank was coerced. Even without her therapist and mother's advice, the record shows that Shank was aware of what she thought were disadvantages to communicating directly with Student One. Shank previously had contacted Student One on her own via a text message and asked if "we could talk about what happened that night so that I can try to get past it." C. 781. Shank subsequently characterized this as "dumb" and "not exactly [her] proudest moment." *Id.* She chose to proceed with the in-person meeting regardless. In addition, Shank exercised control over aspects of the meeting. She told Carlson that she refused to meet with Student One if anybody else was present, C. 76, and she prepared "guidelines" for the conversation before it occurred, *see* S. 444–45; C. 710–11. Shank does not assert that she was incapable of making sound decisions or, more to the point, that Carleton knew or should have known that her decisions could not be trusted—in other words, that Carleton's failure to protect Shank from her decisions shows deliberate indifference. Nor could a reasonable juror conclude that some other aspect of the in-person meeting shows deliberate indifference. Carleton heeded Shank's condition that no one but Shank and Student One would attend the meeting and took steps to protect Shank during the meeting. The meeting occurred in

an office adjacent to Carlson's, and Carlson was present in her office and available to respond quickly if Shank requested help. C. 76, 164. Finally, as far as Carleton knew at the time, the meeting was not upsetting to Shank. Immediately after the meeting, Shank and Student One jointly requested that the no-contact order imposed as a sanction on Student One be lifted. C. 716; S. 449.

The Dear Colleague Letter, S. 413–31, discouraged colleges from using mediation to resolve certain sexual-misconduct complaints:

> Grievance procedures generally may include voluntary informal mechanisms (*e.g.*, mediation) for resolving some types of sexual harassment complaints. OCR has frequently advised recipients, however, that it is improper for a student who complains of harassment to be required to work out the problem directly with the alleged perpetrator, and certainly not without appropriate involvement by the school (*e.g.*, participation by a trained counselor, a trained mediator, or, if appropriate, a teacher or administrator). In addition, as stated in the *2001 Guidance*, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process. Moreover, in cases involving allegations of sexual assault, mediation is not appropriate even on a voluntary basis. OCR recommends that recipients clarify in their grievance procedures that mediation will not be used to resolve sexual assault complaints.

S. 420.

Under the circumstances of this case, the Dear Colleague Letter does not create a genuine issue of material fact as to whether Shank's in-person meeting with Student One shows deliberate indifference by Carleton. A violation of the Letter's guidance does not establish deliberate indifference; it is one consideration in determining whether deliberate indifference has been shown. *Doe v. Forest Hills Sch. Dist.*, No. 1:13-CV-428, 2015 WL

9906260, at *10 (W.D. Mich. Mar. 31, 2015) (citing *Gebser*, 524 U.S. at 292). This makes sense. Advice from the OCR is not binding; it does not carry the force of law possessed by administrative requirements codified in the Code of Federal Regulations. *See also Roe v. St. Louis Univ.*, 746 F.3d 874, 883–84 (8th Cir. 2014) (observing that the Supreme Court "has never held that" violation of Title IX's administrative requirements establishes deliberate indifference (citations omitted)); *see also Karasek v. Regents of the Univ. of Cal.*, No. 15-CV-03717-WHO, 2015 WL 8527338, at *13–14 (N.D. Cal. Dec. 11, 2015) ("There are undoubtedly situations in which a school's conduct in violation of the DCL [Dear Colleague Letter] also amounts to a clearly unreasonable response under *Davis*. But I agree with the University that the DCL does not define what amounts to deliberate indifference . . . I will look to *Davis* and its progeny, not the DCL."). And here, it is at least reasonably debatable whether Carleton's suggestion of an in-person meeting violated the Dear Colleague Letter's guidance. Carleton did not use mediation "to resolve" the sexual assault complaint it filed against Student One. S. 420. By the time Shank met with Student One, the disciplinary process had been completed. The Community Board on Sexual Misconduct already had determined that Student One violated Carleton's sexual-misconduct policy and sanctioned him. The in-person meeting thus was not undertaken to "require[ Shank] to work out the problem directly with the alleged perpetrator," *id.*; Shank wasn't required to participate in the meeting. And once Shank chose to participate, the meeting did not proceed "without appropriate involvement by the school." *Id.*

The opinions of Shank's two expert witnesses also do not create a genuine issue of material fact about whether the in-person meeting shows deliberate indifference by Carleton because they do not address meaningfully the facts surrounding Shank's in-person meeting with Student One. Shank proffers her first witness, Dr. Mary Koss, as an expert in restorative justice. Koss testified in her deposition that an in-person meeting "is not a part of any recognized form of restorative justice," and is "a dangerous practice." S. 570–71; S. 435. She also testified that Carleton violated "gold standard practices" of restorative justice by, for example, failing to meet with Shank beforehand to prepare her and by not having a facilitator present. *See* S. 436, 438–39. Shank's second expert, Dr. Jennifer Freyd, testified regarding "institutional betrayal" and said that "if you told anyone, I think, in the main of sexual violence, whether they're a researcher or anything else, they'd be, like, 'No, don't put these two people alone in a room together, not at this point. Not without a whole lot of safety precautions taking place." S. 14.03, 765. Accepting these propositions as a general rule does not show deliberate indifference by Carleton here because there is no genuine issue of material fact that Shank's participation in the meeting was voluntary and she insisted that no one else be present. It is possible to hypothesize a different case where, for example, a meeting is not voluntary or a school knows or should know that a victim's ability to make rational decisions is compromised, but neither Shank nor her experts argues that this is one of those cases.

e

Shank argues that the sanctions imposed on Student One and Student Two were unreasonably insufficient and that this shows deliberate indifference by Carleton. *See*

Mem. in Opp'n at 33–34, ¶ 14. Shank asserts that Student One should have been removed from campus and that Carleton failed to enforce the no-contact order imposed on him. *Id.* at 27, 33, ¶ 10, 36. She asserts that Carleton should have removed Student Two rather than imposing a no-contact order on him. *Id.* at 30 & 34, ¶ 15.

Title IX establishes a relatively high bar for plaintiffs who claim that the insufficiency of school-imposed sanctions shows deliberate indifference. In *Davis*, the Supreme Court made clear that "courts should refrain from second-guessing the disciplinary decisions made by school administrators," and added that its holding "does not mean that [funding] recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." 526 U.S. at 648 (citations omitted). Victims do not "have a Title IX right to make particular remedial demands." *Id.* (citation omitted); *see also Maher*, 915 F.3d at 1213 (recognizing that a Title IX plaintiff's "dissatisfaction with the school's response does not mean the school's response can be characterized as deliberate indifference" (citing *Ostrander v. Duggan*, 341 F.3d 745, 751 (8th Cir. 2003))). The latitude *Davis* accords school administrators reflects the common-sense notions that different administrators reasonably might reach different conclusions regarding appropriate sanctions under even equivalent circumstances and that sanctions decisions may require difficult balancing of opposing fact accounts and interests. *See Davis*, 526 U.S. at 682 (Kennedy, J., dissenting) ("One student's demand for a quick response to her harassment complaint will conflict with the alleged harasser's demand for due process.") Applying these principles, federal courts have entered pretrial judgment against claims asserting deliberate indifference based

on a school's decision not to remove an alleged rapist from campus. In *Ha v. Northwestern University*, No. 14C895, 2014 WL 5893292 (N.D. Ill. Nov. 13, 2014), for example, the plaintiff argued that a no-contact order was insufficient and that her rapist's continued presence on campus caused her to feel unsafe and experience panic attacks. *Id.* at *1. The court held that the plaintiff's claims were not actionable under Title IX because she had no right to "particular remedial demands" and because her allegations that she had "an occasional glimpse" of her assailant and that "knowledge of [his] presence on the campus caused her considerable grief" were legally insufficient to support a Title IX claim. *Id.* at *2; *see also DeWeese v. Bowling Green Indep. Sch. Dist.*, 709 F. App'x 775, 778 (6th Cir. 2017) (affirming entry of summary judgment for school district and finding no deliberate indifference where a no-contact order had been implemented because, although victim saw her rapist daily, there were no further "interactions" between the two); *Ramser*, 276 F. Supp. 3d at 993 ("[A]lthough seeing [her rapist] on campus was undoubtedly disturbing to Plaintiff, that USD did not take additional measures . . . does not demonstrate deliberate indifference."). Courts have reached different results when evidence shows that a school's failure to remove a rapist or enforce a no-contact order exposes a victim to a risk of assault or continued harassment. *See*, *e.g.*, *Joyce v. Wright State Univ.*, No. 3:17-CV-387, 2018 WL 3009105, at *8 (S.D. Ohio June 15, 2018); *J.K. v. Ariz. Bd. of Regents*, No. CV06-916-PHX-MHM, 2008 WL 4446712, at *17 (D. Ariz. Sept. 30, 2008).

Here, no reasonable juror could conclude that Carleton's sanctions decisions with respect to Student One showed deliberate indifference. The Community Board on Sexual Misconduct imposed seven sanctions on Student One. C. 575–76. The sanctions were

significant and reflected reasoned consideration. *See id.* The no-contact order was extensive and explicit. C. 635. Though Carleton lifted the order in October 2012, this was at Shank's request following her in-person meeting with Student One. C. 716; S. 449. When the no-contact order was in place, there is no evidence showing that it was ineffective, that Carleton did not enforce it, or that Student One violated it without consequences. When Shank encountered Student One in a course in January 2015 and asked that the order be reinstated and that Student One be required to drop the course, Carleton complied the next day. C. 86–87, 523, 749, 751, 753. Soon after Shank reported encountering Student One at the computer science gala, Carleton required Student One to complete his degree off-campus. C. 463–64, 487, 641, 643, 768–69, 772. Shank does not contend, and no evidence shows, that Student One's presence on campus while under the no-contact order caused a risk of further assault or other materially adverse consequences for her. Though the evidence shows that the decision not to remove Student One from campus immediately may have been unusual among students found to have violated Carleton's sexual-misconduct policy under comparable circumstances, the Board's decision to impose the sanctions it did reflects the exercise of flexibility in judgment permitted by *Davis*. 526 U.S. at 648.

Nor could a reasonable juror conclude that Carleton's sanctions decisions with respect to Student Two showed deliberate indifference. Shank and three other female Carleton students jointly reported Student Two's behavior in a Community Concern Form on April 24. C. 744–47; S. 450–57. Baggot met with Student Two the next day and ordered Student Two not to have any contact with any of the four women who submitted the form

"from this day forward." C. 671.  Baggot provided written instructions clarifying the scope of his order.  *Id.*  As with Student One, no evidence shows that this no-contact order was ineffective or that Student Two's presence on campus while under the order caused a risk of further assault or other materially adverse consequences for Shank.[7]

f

Shank argues that Carleton's failure to remove posters of Student One knowing that the posters triggered "intrusive PTSD symptoms," C. 44; *see also* C. 47, shows deliberate indifference, Mem. in Opp'n at 11–13, 32–33, ¶ 3.  Understanding this issue requires a description of the poster.  (Including a copy of the poster in this opinion would disclose Student One's identity.)  The poster is essentially a photograph of Student One.  S. 241. He is shown standing with both hands on his head and his elbows wide.  He is naked from the waist up.  He is wearing tight-fitting, low-riding black athletic shorts or pants.  The

---

[7]     Shank's deposition testimony that Carlson "talked [her] out of" filing a formal complaint, C. 77, creates no genuine issue of material fact as to deliberate indifference for several reasons.  Shank's contemporaneous writings made clear that she did not want to file a formal complaint.  C. 720 ("I don't think I can handle having my name attached to anything involving [Student Two] right now," and "[t]his seems like a really complex situation, and I think the best thing right now might be to distance ourselves from him . . . I'm just really worried about school right now and I don't think letting this distract me any more than it already has would be good for anyone."); C. 725 (writing that she would "not involve [her]self with any kind of [Student Two] drama"); C. 745 ("I have no intention of filing anything with the Sexual Misconduct Board, since my emotional baggage makes it very hard for me to see what happened with [Student Two] in an objective way.").  Shank's reluctance to file a formal complaint aside, she joined in filing a Community Concern Form describing the incident and the facts leading to it in detail.  C. 744–47; S. 450–57.  The filing of these forms in Student One's case led Carleton to pursue a formal complaint.  *See* S. 254.  And in Student Two's case, the filing of the form resulted in the imposition of a no-contact order.  *See* C. 671.

poster contains a "Carleton Track [and] Field" caption above Student One and the phrase "GO HARD" over his upper thighs. *Id.*

The evidence would permit a reasonable juror to conclude that Shank suffered adverse health consequences as a result of encountering the posters and that Carleton knew this. Shank mentioned the posters to a physician during her February 2012 hospitalization. S. 8 (recording Shank's statement that Student One is on the track team and "has posters of him all over the school"). In her deposition, Shank testified that seeing the posters caused the rape by Student One to "just [keep] replaying" and "made [her] want to die." C. 44. In response to a question asking whether she told Baggot about the posters, Shank testified: "Yes, during our first meeting [on February 15], just explaining how I, like, ended up in the hospital, basically." *Id.* Shank also testified that she told Baggot the posters "triggered the memories of the violence," caused her to feel "trapped," and that "it was hard to deal with them." C. 47. (Baggot testified that he did not recall Shank telling him about the posters and that, if she had, then he would have documented that issue in his contemporaneous Community Concern Form. C. 111, 115–16. But that doesn't matter here. Because Carleton seeks summary judgment, Shank's testimony must be believed.) Before telling Baggot, Shank had not told anyone at Carleton about the posters. C. 45. Shank did not ask Baggot to do anything about the posters. C. 47. The record reflects no further communications between Shank and Baggot or any other Carleton official regarding the posters.

Other facts concerning the posters are not clear. There is no evidence showing who created or displayed the posters. Though the poster obviously concerns "Carleton Track

[and] Field," there is no evidence showing whether the poster was authorized by the team's coach or another Carleton official, or whether the poster was the creation of perhaps team members. There is no evidence showing when the posters first appeared, only that Shank first saw them shortly before her hospitalization on February 12. C. 44–45. In an affidavit, Shank testified that posters remained displayed in her first dormitory, Goodhue Hall, in April 2012. S. 243–44. Shank testified that the poster was visible when you "walk[ed] in the doors" to Goodhue Hall, along with a poster of another shirtless track team member. C. 45. Shank also testified that she saw the poster in Carleton's recreation center. *Id.* She could not recall seeing the poster in any other location. *Id.* No Carleton employee who was deposed recalled seeing the posters on campus, but none disputed that they had been displayed on campus. *See*, *e.g.*, C. 107, 430, 475, 507; S. 195–96.

Shank's evidence concerning the posters of Student One raises a closer question but is not sufficient to create a triable issue regarding Carleton's deliberate indifference. Shank's deposition and affidavit testimony—which must be accepted here—shows that a Carleton official knew of the posters' adverse impact on Shank's health by February 15, 2012, C. 44, and that they remained displayed on campus (including in Shank's dormitory) at that time, S. 243–44, but did nothing to address them. Apart from Shank's deposition testimony that she verbally communicated her concern about the posters to Baggot when she first met with him on February 15, C. 44, there is no evidence showing that Shank communicated at any other time or with anyone else at Carleton regarding the posters. Her emails to various Carleton officials, for example, do not mention this issue. She did not ask Baggot to do anything about the posters. C. 47. The record does not show that she

asked any other Carleton official to take action concerning the posters. This is not to suggest that a Title IX plaintiff must request—and be denied—particular relief as a precondition to suing. That's not the law. It is to say that, viewed in the context of Carleton's entire response to Shank's rape by Student One and in the light of all record evidence, Carleton's inaction regarding the Student One posters does not show deliberate indifference.

\*

The law sets a high bar when it requires Title IX plaintiffs to show deliberate indifference. That high bar is not met by evidence showing imperfection or even negligence in a school's response to rape, other forms of sexual assault, or sexual harassment. *Davis*, 526 U.S. at 648; *Dardanelle School Dist.*, 928 F.3d at 725. Here, no reasonable juror could conclude that Carleton's response to Shank's reports of her two rapes was deliberately indifferent. Therefore, Carleton's summary-judgment motion against Shank's Title IX claim will be granted.

## B

Shank asserts claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, and section 504 of the Rehabilitation Act ("section 504"), 29 U.S.C. § 794. Second Am. Compl. ¶¶ 223–35. These claims are properly assessed together because "the substantive standards of § 504 . . . and the ADA are the same." *Loye v. Cty. of Dakota*, 625 F.3d 494, 496 (8th Cir. 2010) (citations and footnote omitted). To prevail on either claim, Shank must show that (1) she is disabled; (2) she made specific requests for (3) reasonable accommodations related to a (4) known disability; and (5) the denial of her

requests (6) deprived her of meaningful access to education.  *See Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006).  Section 504 of the Rehabilitation Act imposes "the additional requirement that . . . the program or activity from which [s]he is excluded receives federal financial assistance," though that element is uncontested.  *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (citation omitted); *see also Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 936 (S.D. Iowa 2018) ("Because the 'discrimination' in a failure to accommodate claim 'is framed in terms of the failure to fulfill an affirmative duty,' a plaintiff is not required to separately show the defendant's actions were motivated by intentional discriminatory animus." (citation omitted)).  Unlike Shank's Title IX claims, her ADA and Rehabilitation-Act claims are not fact-bound to the rapes or Carleton's response to the rapes.  The cause of her disability is irrelevant—what matters is whether she is disabled, whether she made specific requests for reasonable accommodations related to a known disability, and whether her requests were denied in a way that denied her meaningful access to education.  *See Mershon*, 442 F.3d at 1076.

The Parties do not dispute that Shank has shown she is disabled.  Though she alleges a nonspecific "disability" in her complaint, Second Am. Compl. ¶¶ 226, 232, Carleton has suggested that her PTSD is the qualifying disability at issue, *see* Mem. in Supp. at 26 [ECF No. 239], and Shank does not contest this in her summary-judgment submissions, Mem. in Opp'n at 42.  *See also* C. 526 ("Current Diagnosis: Post-traumatic Stress Disorder (recurrence)" and "Obsessive-Compulsive Disorder in partial remission").

Shank identifies many accommodations that she alleges Carleton failed to provide her, but only those requests made after Carleton knew of her disability matter.  (Other

requests were not made to accommodate a "known disability.")  Shank notified Carleton of her disability—PTSD—on February 23, 2015, during her senior year.  C. 526–28.  She requested the following accommodations on or after that date:

> Ability to access to classroom content via video recording
> Notetaker or photocopy of another student's notes
> Substitute assignments in specific circumstances
> Written assignments in lieu of oral presentations or vice versa
> Extended time to complete assignments
> Alternate testing space
> Verbal vs. written testing
>
> Disability may impact class attendance: requirements and parameters of attendance may need to be redefined.

C. 528.

Assuming these are reasonable requests related to Shank's disability—her medical provider's report does not clearly identify how these accommodations relate to her PTSD—no reasonable fact-finder could conclude that they were denied.  The same day that Shank submitted a "Verification of Disability" and requested accommodations, she met with Andy Christensen, Carleton's Coordinator of Disability Services.  *See* C. 763.  Christensen sent Shank a thorough, two-page, single-spaced email summarizing her requested accommodations and his response.  C. 763–64.  Christensen granted her requests for a notetaker and alternate testing space.  *Id.*  Though he tentatively denied Shank's request to access courses via video recording, explaining that "even under optimal circumstances it compromises your access to the curriculum," C. 763, he instead offered to re-locate all of Shank's classes to "to spaces on campus that minimize the adverse effect of [Shank's] disability, allowing [her] to attend class physically," *id.*  Shank approved of this option.  *Id.*

Christensen did not outright approve or deny Shank's remaining requests for substitute assignments, written versus oral assignments, extended time for assignments, verbal versus written testing, and redefined attendance requirements. *See* C. 764. Instead, he remained open to these requests and explained that they would best be handled "instance by instance rather than a blanket decision" but that he was "willing to do this work . . . [that] will involve negotiating with professors." *Id.*[8] Because Shank's requests were not denied, she cannot establish a necessary element of her ADA and Rehabilitation-Act claims, and summary judgment must be entered against these claims.

## C

In his order partially granting Carleton's Rule 12(b)(6) motion to dismiss, Judge Schiltz allowed Shank to proceed with her negligence claims, Second Am. Compl. ¶¶ 236–45, on two theories: first, that Carleton was negligent in failing to prevent the on-campus rapes, and second, that Carleton negligently responded to the rapes. *Shank*, 232 F. Supp. 3d at 1110–11. At the hearing on this motion, Shank abandoned her claim that Carleton was negligent in failing to prevent the rapes. Tr. at 23–24, 43–44. Shank argues that the same evidence that shows Carleton's deliberate indifference under her Title IX claim "also support[s] Shank's claim that Carleton was negligent in its responses." Mem. in Opp'n at 36.

---

[8] Even if some of Shank's requests could be considered denied, Christensen's initial decision shows "some amount of reasoned consideration or professional judgment," *Forbes v. St. Thomas Univ., Inc.*, 768 F. Supp. 2d 1222, 1232–33 (S.D. Fla. 2010), which courts should be hesitant to "second-guess," *Dardanelle Sch. Dist.*, 928 F.3d at 725 (quoting *Davis*, 526 U.S. at 648).

Under Minnesota law, a negligence claim almost always requires some showing of physical harm. *See*, *e.g.*, *McKenzie v. Lunds, Inc.*, 63 F. Supp. 2d 986, 1007 (D. Minn. 1999) (dismissing negligence claims as a matter of law "for want of an essential element"—"some threatened or actual instance of physical harm" (citations omitted)). A plaintiff is entitled to recover for emotional-distress damages in three circumstances:

> First, a plaintiff who suffers a physical injury as a result of another's negligence may recover for the accompanying mental anguish. Second, a plaintiff may recover for negligent infliction of emotional distress when physical symptoms arise after and because of emotional distress, if the plaintiff was actually exposed to physical harm as a result of the negligence of another (the "zone-of-danger" rule). Finally, a plaintiff may recover emotional distress damages when there has been a direct invasion of the plaintiff's rights such as that constituting slander, libel, malicious prosecution, seduction, or other like willful, wanton, or malicious conduct.

*Lickteig v. Alderson, Ondov, Leonard & Sween, P.A.*, 556 N.W.2d 557, 560 (Minn. 1996) (citations and internal quotation marks omitted). Here, the arguably physical injuries Shank identifies (such as insomnia, panic attacks, and cutting injuries) are manifestations of her emotional injuries (including PTSD, anxiety, and obsessive-compulsive disorder), not standalone physical injuries. *See* Mem. in Opp'n at 39 n.138. For this reason, as Judge Schiltz suggested, Shank's negligent-response claim is best characterized and analyzed as a claim for negligent infliction of emotional distress. *Shank*, 232 F. Supp. 3d at 1111 ("Carleton's allegedly negligent response to the rapes caused Shank to suffer emotional injuries, but it did not inflict or risk inflicting any physical injuries."); *see also Langeland v. Farmers State Bank of Trimont*, 319 N.W.2d 26, 31 (Minn. 1982) ("In cases in which physical symptoms occur subsequent to and because of the plaintiff's emotional

disturbance, many jurisdictions, including [Minnesota], require the plaintiff to have been in some personal physical danger caused by the defendant's negligence before awarding damages for emotional distress." (citations omitted)).

This framing of Shank's negligent-response claim is consistent with the Minnesota Supreme Court's hesitancy "to expand the availability of damages for emotional distress" and its careful limitation of such damages to "plaintiffs who prove that emotional injury occurred under circumstances tending to guarantee its genuineness." *Grozdanich v. Leisure Hills Health Ctr., Inc.*, 48 F. Supp. 2d 885, 892 (D. Minn. 1999) (citations and internal quotation marks omitted). "A plaintiff who is physically injured by a defendant's negligence can recover for past and present mental anguish suffered as a result of those injuries. But where the defendant's negligence causes emotional distress without any accompanying physical injury," as Shank alleges here, "a plaintiff can recover for emotional disorders only if [s]he *(a)* is within the zone of danger created by the defendant's negligence, and *(b)* exhibits physical manifestations of emotional distress." *Iacona v. Schrupp*, 521 N.W.2d 70, 72 (Minn. Ct. App. 1994) (citations omitted).

No reasonable juror could conclude that Shank ever was in a "zone of danger" of immediate physical impact as a result of Carleton's response to the rapes, so her negligent-infliction-of-emotional-distress claim fails as a matter of law. To the extent that the entire Carleton campus could constitute a zone of danger of experiencing a rape (certainly a physical injury), Shank does not allege that allowing Student One or Student Two to remain on campus put her at risk of another sexual assault. *See* Mem. in Opp'n at 38–39. To the extent that the Carleton campus could constitute a zone of danger of encountering her

rapids, itself a dubious proposition,[9] Shank alleges only that allowing Student One and

Student Two to stay on campus put her at risk of purely emotional harm with physical

manifestations. *See* Mem. in Opp'n at 38–39 & n.137. Because Shank cabins her claim to

a zone of danger of emotional harm, not a zone of danger of physical harm, Carleton is

entitled to summary judgment.[10]

---

[9] As Judge Schiltz recognized, "this type of generalized risk is nothing like the type of specific risk of imminent physical injury that Minnesota courts have required." *Shank*, 232 F. Supp. 3d at 1112. For a negligent-infliction-of-emotional-distress claim to be valid, the situation must make it "abundantly clear that plaintiff was in grave personal peril for some specifically defined period of time." *K.A.C. v. Benson*, 527 N.W.2d 553, 558 (Minn. 1995). Examples include being a passenger on an airplane during a minute-long, uncontrolled tailspin, *Quill v. Trans World Airlines, Inc.*, 361 N.W.2d 438, 440, 443 (Minn. Ct. App. 1985); narrowly escaping a building collapse while inside a store dressing room, *Okrina v. Midwestern Corp.*, 165 N.W.2d 259, 261 (Minn. 1969); and nearly being struck by a vehicle that did, in fact, hit and injure another, *Engler v. Ill. Farmers Ins. Co.*, 706 N.W.2d 764, 765–66 (Minn. 2005). Sharing a large campus space for a span of years seems far removed from these examples. What's more, some of Shank's own decisions, such as lifting the no-contact order against Student One, placed her in this alleged zone of danger. *See Wall v. Fairview Hosp. & Healthcare Servs.*, 584 N.W.2d 395, 408 (Minn. 1998) (reinstating directed verdict in favor of defendant on plaintiff's negligent-infliction-of-emotional-distress claim where plaintiff's "own decisions regarding her living situation placed her in the zone of danger, if any, from her armed and suicidal roommate").

[10] Two weeks after oral argument, Shank filed a letter requesting to supplement the record with a six-page affidavit from Shank "that described her physical and emotional injuries." ECF No. 315. This evidence was described as "in a real sense an offer of proof as to potential damages evidence at trial." *Id.* This evidence could have been filed as part of Shank's opposition to Carleton's summary-judgment motion, and no reason has been identified to explain why it was not. The contents of this affidavit seem redundant of information that is already in the (more than 2,000-page) record, albeit in a different form. *See id.* (indicating the affidavit "contributes a coherent, orderly and non-controversial overview of her conditions and injuries," such as her self-harm behavior and sleep disturbances). The request to supplement the record with this evidence will be denied.

D

To prevail on her intentional-infliction-of-emotional-distress claim, Shank must establish that: "(1) the conduct was extreme and outrageous; (2) the conduct was intentional or reckless; (3) [the conduct] caused emotional distress; and (4) the distress was severe." *K.A.C. v. Benson*, 527 N.W.2d 553, 560 (Minn. 1995) (citation omitted). These elements track the elements of a negligent-infliction claim, but there is no "zone of danger" constraint, and there is an added requirement of intentionality or recklessness. In his order partially granting Carleton's motion to dismiss, Judge Schiltz permitted this claim to proceed based on Shank's allegation that Carleton coerced her into a one-on-one meeting with her rapist. *Shank*, 232 F. Supp. 3d at 1114.

As with Shank's Title IX claim premised on the same facts, her intentional-infliction-of-emotional-distress claim fails as a matter of law. No reasonable juror could conclude that Shank was coerced into the meeting. She participated voluntarily. Carleton is correct that there do not appear to be any cases "in which an IIED claim was based on actions that the plaintiff chose to take." Mem. in Supp. at 36. Also, Carleton did not intentionally or recklessly expose Shank to severe emotional distress. Carleton officials did not have "knowledge that it [was] substantially certain, or at least highly probable, that severe emotional distress [would] occur." *Benson*, 527 N.W.2d at 560 (citing *Dornfeld v. Oberg*, 503 N.W.2d 115, 119 (Minn. 1993)).[11]

---

[11]    Because none of Shank's underlying claims survive, summary judgment will be entered against Shank's claim for punitive damages, also.

**ORDER**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1.     Carleton's Motion for Summary Judgment [ECF No. 237] is **GRANTED**; and

2.     Shank's request to supplement the record [ECF No. 315] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  August 22, 2019                              s/ Eric C. Tostrud
                                                                  Eric C. Tostrud
                                                                  United States District Court